Jeanette JOYNER, Appellant,

v.

SIBLEY MEMORIAL HOSPITAL,
et al., Appellees.

No. 01–CV–124.

District of Columbia Court of Appeals.

Argued March 26, 2002.
Decided June 12, 2003.

Donald M. Temple, Washington, DC, with whom Jeanett P. Henry was on the brief, for appellant.

John G. Kruchko, with whom Kara M. Driscoll was on the brief, McLean, VA, for appellees.

Before RUIZ and GLICKMAN, Associate Judges, and KING, Senior Judge.

KING, Senior Judge:

Jeanette Joyner contends that the trial court erred in entering summary judgment on some counts in her complaint and dismissing, without prejudice, the remaining counts in favor of appellees Sibley Memorial Hospital ("Sibley") and Jill Stanton.[1] We affirm in part and reverse in part.

---

1. Collectively, Sibley and Stanton are identified as "appellees."

## I. FACTUAL AND PROCEDURAL BACKGROUND

When the incidents underlying the claims in this case arose, Joyner was a part-time clerk typist in the Medical Records Department ("MR") and a part-time clerk typist in the Medical Staff Privileges Department ("MSP") at Sibley. This appeal arises out of a series of events involving Joyner and Stanton, who was an employee of the hospital and Joyner's then supervisor in MR.

### A. *Facts*

Joyner is an African–American female who was sixty-one years of age at the time of the events giving rise to this action. She began her employment with Sibley in 1977 as a receptionist in MR. In 1981, Joyner transferred to a position of clerk typist in MSP. In 1992, Sibley underwent some administrative reorganization, and Joyner's post in MSP was reduced to part-time. However, she was also reassigned to part-time duties in her former department as clerk typist in MR, thus retaining a full-time status overall.

In November of 1996, there was a change in the management of MR, and Stanton assumed the position of Director. Shortly thereafter several incidents occurred, which Joyner asserts as the basis of her claims here. On December 9 of that year, Stanton issued a verbal reprimand to Joyner based upon a complaint Stanton had received regarding Joyner's allegedly inappropriate response to a request for a patient's file from a doctor's office. On December 30, Joyner received her 1996 performance evaluation, which reflected a lower score than she had received in previous years from other supervisors. This evaluation also deferred final disposition of Joyner's evaluation for ninety days, during which she was to complete a course on WordPerfect.

On January 9, 1997, Joyner was given an assignment, which she called "unusual," to obtain a large number of files from an adjacent building and then return the files once they had been properly coded.[2] As a result of a report that Joyner had left those files unattended, Stanton verbally admonished her.[3] On January 27, Joyner again received a verbal reprimand, her second, because she repeatedly punched in on the time clock more than a few minutes prior to her scheduled start time in violation of the procedures set forth in a recently circulated memorandum applicable to all employees.

On January 31, 1997, Joyner submitted a written response in her defense to the verbal reprimand dated December 9, 1996 relating to the complaint regarding an allegedly inappropriate response to a doctor's office's request for a patient's files. She maintained that the incident that precipitated the reprimand was simply a misunderstanding. She indicated that the person to whom she released the files, the husband of the patient whose files were the subject of the request, was

---

2. Joyner considered the assignment to be unusual because she had never before been required to leave her building, and the files she was to retrieve were maintained in what Joyner described as an unventilated basement. Further, on December 31, 1996, she had broken her toe. Her injury was not work-related, and she did not inform appellees of the injury. However, she nevertheless contends that the injury aggravated the "unusual" nature of the assignment, imputing notice of the injury to Stanton. There are no record facts to support this claim.

3. This admonition was an "informal" warning, as distinguished from the "verbal" reprimand Joyner received on December 9, 1996, and the "verbal" reprimand that she subsequently received on January 27, 1997, both of which were "formal" reprimands.

satisfied with Joyner's performance. To support that claim, she submitted a commendation letter from the husband. Joyner's response, however, revealed her possible violation of hospital policy in two ways: release of confidential medical records without signed authorization from the patient, and solicitation of a letter of commendation from patients or their families. As a result, Stanton drafted a written reprimand on February 3, 1997 setting forth the two violations, and scheduled a meeting with Joyner for February 7, 1997.

The meeting was held in Stanton's office. At that meeting, Stanton characterized Joyner's explanation of events in her January 31 response as a "scenario," which angered Joyner, who then attempted to leave. Stanton then allegedly slammed the door on Joyner's hand in an attempt to prevent Joyner from leaving. Joyner then left the room, earning her a five-day paid leave in lieu of suspension for her "insubordination." Although she refused to return to MR upon the expiration of her leave, she remained employed as a clerk typist in MSP. She contends that all of these incidents amounted to discrimination based on her age and race.

## B. *Procedural Background*

In her complaint, Joyner set forth seven causes of action against both appellees jointly and severally: (1) a count for assault and battery; (2) a count for intentional infliction of emotional distress; (3) a count for negligent hiring and supervision; (4) another count for negligent supervision; (5) a count of false imprisonment; (6) a count for constructive discharge; and (7) a count for age and race discrimination in violation of the District of Columbia Human Rights Act ("DCHRA").

The first count, assault and battery, was based upon Joyner's claim that during the February 7, 1997 meeting, Stanton crushed Joyner's hand in the door. Joyner also contended that, through this behavior, appellees "intentionally caused severe emotional distress to Joyner by way of extreme, reckless, and outrageous conduct" giving rise to the second count, intentional infliction of emotional distress. The third and fourth counts were based on Joyner's contention that Stanton was "manifestly unfit to serve as Director of Medical Records," and that Sibley's failure to recognize her unfitness and to take corrective action breached Sibley's duty of care to its employees "relative to their personal safety, security and well-being in application of [Sibley's] policies and practices."

The fifth count, false imprisonment, was also based on Stanton's conduct at the February 7 meeting, when Stanton directed Joyner to remain in the room and allegedly slammed the door on Joyner's hand, both of which "unreasonably den[ied] [Joyner] the right to leave the office." The sixth count, constructive discharge, was based on the fact that Sibley gave Joyner an "ultimatum" to return to her allegedly hostile work environment in MR or face termination, which Joyner claims Sibley knew would create undue hardship for Joyner. According to Joyner, this ultimatum "subjected [her] to a constructive discharge [that] caused her to loose [sic] benefits, income, prestige and honor." Finally, the seventh count, violation of the DCHRA, is based upon Joyner's contention that appellees' disciplinary actions directed toward Joyner were motivated by discrimination against senior members of minority groups.

On April 20, 1998, appellees filed a motion to dismiss the complaint, and Joyner filed an opposition on May 11, 1998. On November 28, 1998, with the consent of the parties, the trial court granted the motion

in part by dismissing the claim against Stanton for negligent supervision (Count IV),[4] as well as the claim against both appellees for negligent hiring and supervision (Count III).

Subsequently, appellees filed their answer to Joyner's complaint, and discovery was undertaken. Appellees then moved for summary judgment, asserting that there were no genuine issues of material fact and that they were entitled to judgment as a matter of law, which Joyner opposed. On December 15, 1999, the trial court entered an order granting in part and denying in part the motion for summary judgment. The trial court granted summary judgment in favor of Sibley on the negligent supervision count (Count IV),[5] and in favor of both appellees on the discrimination (Count VII), constructive discharge (Count VI), and intentional infliction of emotional distress counts (Count II). The trial court also dismissed the claims against both parties for assault and battery (Count I) and false imprisonment (Count V) on the ground that the District of Columbia Workers' Compensation Act ("WCA") provided Joyner's exclusive remedies for those claims and that she therefore was required to pursue her claims relating to those counts with the District of Columbia Department of Employment Services ("DOES").[6] This appeal followed.

## II. DISCUSSION

Joyner maintains that the trial court erred in granting summary judgment in favor of appellees on the discrimination claim because she contends that she made a *prima facie* case on that claim and that there are genuine issues of material fact that precluded the entry of summary judgment. She also contends that if this court reverses the trial court's grant of summary judgment on the discrimination claim because of the existence of genuine issues of material fact, "it follows therefrom that the same issues will demonstrate the existence of genuine issues of material fact for

---

**4.** Count IV was dismissed against Stanton alone. It remained as a count against Sibley. See note 5, *infra.*

**5.** As noted above, see note 4, *supra,* Count IV had earlier been dismissed as to Stanton.

**6.** After granting summary judgment on the claims indicated, the trial court observed that "[b]y granting the motion for judgment as to claims under the DCHRA, all that remains are common law tort claims," without explicitly specifying the claims to which the court referred. The trial court then dismissed, on primary jurisdiction grounds, "the remainder of the Complaint so that plaintiff [could] present her claims to the appropriate administrative forum," ruling that Joyner's exclusive remedy for the alleged torts was the administrative forum established by the WCA. It appears at first look that the trial court's reference to the "remainder of the Complaint" refers to the assault and battery and the false imprisonment counts, *and* the intentional infliction of emotional distress count, all of which were the common law tort claims set forth in the complaint. However, in its order,

the court entered judgment "in favor of [appellees] as to all claims of discrimination based on age and race made under the DCHRA, including Count VII (Intentional Infliction of Emotional Distress)." [R. at 484.] This comment is confusing because the intentional infliction of emotional distress claim is set forth in Count II, not Count VII. Nevertheless, based on the language of the order, it is clear to us that the trial court intended to enter summary judgment on the intentional infliction count. We reach that conclusion because the trial court cited *Estate of Underwood v. National Credit Union Admin.,* 665 A.2d 621 (D.C.1995), in which we ruled that the DOES does not have primary jurisdiction over emotional distress claims. Thus, the trial court understood, as to that claim, that it could not dismiss that count to allow presentation of the claim to the DOES. We are therefore satisfied that entry of summary judgment on the intentional infliction count is the course of action intended by the trial court.

[the] constructive discharge claim." Joyner also appeals from the dismissal of the assault and battery claim, arguing that the Superior Court, and not the Department of Employment Services, has primary jurisdiction over that claim. In discussing Joyner's contentions, we first review the trial court's rulings on the counts for which summary judgment was granted, which we affirm. We will then review the order dismissing, without prejudice, the assault and battery and false imprisonment claims, which we reverse.[7]

### A. Summary Judgment

Joyner argues that the trial court erred in granting summary judgment on the discrimination and constructive discharge claims, and, by implication, the intentional infliction of emotional distress claim.

#### 1. Standard of Review

We review the grant of a motion for summary judgment *de novo*. In reviewing a trial court order granting summary judgment, we conduct an independent review of the record, and our standard of review is the same as the trial court's standard in considering the motion for summary judgment. A motion for summary judgment should be granted whenever the court concludes that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law. Though we view the evidence in the light most favorable to the non-moving party, mere conclusory allegations by the non-moving party are legally insufficient to avoid the entry of summary judgment. Thus, a party opposing a motion for summary judgment must produce at least enough evidence to make out a prima facie case in support of his position.

*Joeckel v. Disabled American Veterans,* 793 A.2d 1279, 1281–82 (D.C.2002) (internal citations omitted). Our review of the grant of summary judgment must, therefore, take into account whether there were any genuine issue of any material fact at the time of entry of judgment, and whether appellees were entitled to judgment as a matter of law. *See id.* at 1281.

#### 2. Age and Race Discrimination

 Joyner asserts that there are genuine issues of material fact regarding her discrimination claim. We disagree. Analysis of discrimination claims is a three-step process:

First, the employee must make a *prima facie* showing of discrimination by a preponderance of the evidence. Once that has been done, a rebuttable presumption

---

**7.** Because Joyner has not challenged in this court the trial court's rulings on either of the negligent supervision claims (Counts III and IV), those rulings are not before us for review. The only discussion in Joyner's brief relating to the intentional infliction of emotional distress count (Count II) is that portion challenging the applicability of the WCA to her common law claims, where she states only that: "Appellant hereby incorporates by reference its argument in Plaintiff's Opposition to Defendants' Motion to Dismiss, to which the court below initially agreed." Nowhere in that opposition, nor in her brief to this Court, does Joyner specifically argue that summary judgment was inappropriate for Count II.

However, because Joyner did oppose entry of judgment in favor of appellees in both the trial court and here, we are satisfied that this issue has been preserved. *W.M. Schlosser Co. v. Maryland Drywall Co.,* 673 A.2d 647, 651 n. 9 (D.C.1996).

Similarly, Joyner's brief on appeal does not specifically contest the dismissal, without prejudice, of the false imprisonment claim (Count V). However, for the reasoning stated with respect to Count II, we are satisfied that Count V is before us for resolution. We consider the false imprisonment claim (Count V) in our discussion of the dismissal of the assault and battery claim (Count I), *infra*.

arises that the employer's conduct amounted to unlawful discrimination. The burden then shifts to the employer to rebut this presumption by articulating some legitimate, nondiscriminatory reason for the employment action at issue. Finally, if the employer has articulated some legitimate, non-discriminatory reason for the disputed conduct, the burden shifts back to the employee to prove, again by a preponderance of the evidence, that the employer's stated justification for its action was not its true reason but was in fact merely a pretext to disguise a discriminatory practice.

*Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 361 (D.C.1993) (internal punctuation, citations, and footnotes omitted).

We will begin our analysis with an examination of the second and third prongs of this test, because we assume without deciding, as did the trial court, that Joyner established a *prima facie* case of discrimination, thus shifting the burden to appellees to articulate a legitimate, nondiscriminatory purpose for the employment actions. We are satisfied that appellees successfully did so, because, as the trial court observed, Joyner "failed to overcome [the] legitimate nondiscriminatory reasons for the actions" or to offer evidence of pretext. The six incidents that formed the basis of the discrimination claim were: (1) the December 9 verbal reprimand for failing to respond properly to a request for medical records; (2) the December 30 performance evaluation, which required Joyner to increase proficiency in her computer skills; (3) the January 9 admonition for leaving medical files unattended; (4) the January 27 verbal reprimand for disobeying the directive prohibiting punching in early on the time clock; (5) the February 3 written reprimand for violating two hospital policies; and (6) the alleged assault and battery in Stanton's office on February 7, 1997. We discuss each in turn.

■ It is not disputed that the verbal reprimand that Joyner received from Stanton on December 9, 1996, was based on a report that someone had complained that Joyner did not respond in a timely fashion to a request for medical records. The trial court concluded, and we agree, that this constitutes a legitimate, nondiscriminatory reason for the employment action. Although Joyner contends that the complaint was unfounded, and in fact tendered her account of the events in her response to the reprimand, she offered no evidence evincing pretext to disguise a discriminatory purpose; she simply suggested that Stanton should have investigated more thoroughly. However, as the trial court observed, Joyner never presented facts rebutting "the key concerns that precipitated the warning," and that even crediting Joyner's account for the factual discrepancies she attempts to establish, "th[e] [verbal reprimand] demonstrates no more than classic miscommunication, not discrimination." Further, despite the fact that Joyner claimed that the reprimand was inconsistent with Sibley's "progressive discipline" policy, and that it was unduly harsh and aggressive, she concedes that it did not "demonstrate[ ] a hostile workplace [ ]or a discriminatory bias."

■ With respect to the December 30, 1996 performance evaluation, we agree with the trial court that the employer supplied a legitimate, nondiscriminatory reason for ensuring that clerk typists be proficient in the use of word processing software. Here, as with her first verbal reprimand, Joyner offers no evidence that this was pretextual. Instead, she simply asserts, without support, that this legitimate proficiency requirement was applied to her retroactively, that she had no notice of the requirement, and that her working knowledge of computers was bet-

ter than that imputed to her by her performance evaluation. Despite this assertion, the record contains uncontroverted evidence to the contrary: her job description required that she be able to type, and she had been put on notice of her computer deficiencies in the prior year's evaluation, "which was not contested, [not] alleged to be discriminating, [n]or drafted by Stanton."

■ With respect to the admonition of January 9, 1997 for leaving medical files unattended, it is undisputed that Stanton received a report that the files were left unattended,[8] and that ensuring the integrity of the chain of custody of confidential medical records is a legitimate, nondiscriminatory reason for employee discipline. Again, Joyner offered no evidence to rebut the legitimate reasons presented or to show that the reason given was pretextual.

■ Similarly, Joyner failed to rebut the explanation offered by appellees with respect to the January 27, 1997 verbal reprimand that she received for reporting to work too early. That reprimand was based on the fact that she did not follow a directive issued by Stanton on January 3, 1997 (a directive issued to *all* employees under Stanton) that employees not clock in more than a few minutes before their scheduled start times. Joyner counters that she was reporting early, but not at the department of which Stanton was supervisor. That explanation, however, does not contradict the fact that (1) there was a published hospital policy on the matter prohibiting punching in early (one that was "a facially neutral directive issued to all employees") and (2) that Joyner violated the policy. Joyner's explanation is therefore insufficient to rebut appellees' legitimate reasons for the reprimand.

■ We are also satisfied that the trial court's ruling on the February 3, 1997 written reprimand was correct. This reprimand was predicated upon Stanton's determination, based upon Joyner's written response to the December 9, 1996 verbal reprimand, that Joyner had violated two hospital policies: the prohibition against the unauthorized release of confidential medical records, and the ban against soliciting commendation letters from patients or their families.[9] Whether or not Joyner

---

**8.** With respect to this point, the trial court engaged in impermissible fact-finding. Joyner denied that she had left the files unattended and asserted that she was falsely accused of wrongdoing. The trial court, however, found as fact that Joyner had indeed left the files unattended, relying upon Joyner's statement that she went to the restroom. Joyner is correct to point out that "trial courts need not—indeed, cannot—make findings of fact when granting a motion for summary judgment. The court's task in ruling on a summary judgment motion is not to resolve any factual issues but, rather, to determine whether any material issues of fact exist." *District of Columbia v. W.T. Galliher & Brother,* 656 A.2d 296, 302 (D.C.1995) (citing *International Underwriters, Inc. v. Boyle,* 365 A.2d 779, 782 (D.C.1976)). However, whether or not the files were actually left unattended is not a material fact. A material fact is one "that has direct and uncontestable bearing on the out-

come of the case." *Hill v. White,* 589 A.2d 918, 921 n. 9 (D.C.1991) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Here, the material fact is Stanton's purpose in admonishing Joyner: was there a legitimate, nondiscriminatory reason (*i.e.,* had it been reported to Stanton that Joyner had left the confidential files unattended). As we said in the text, that fact is undisputed.

**9.** The trial court determined that Joyner had "admitted in her [January 31, 1997] memorandum that she solicited a letter of commendation from the patient or the patient's family ...." However, Joyner asserts that she "did not solicit a letter of commendation only verification and the letter does in fact verify Joyner's version of the incident [sic]," thus arguably raising a question of fact. As we have noted, *supra,* note 8, a trial court may not make any findings of fact in passing on a

actually solicited the commendation letter is not a material fact. The operative material fact is whether or not Stanton had a legitimate, nondiscriminatory reason to discipline Joyner. Evidence of violation of hospital policy—namely, the existence of the commendation letter—is sufficient to establish such a legitimate, nondiscriminatory reason. The fact that Joyner had the letter is not in dispute. Moreover, it is also quite clear that Joyner released confidential medical records without written consent of the patient, a point not addressed, much less challenged, by Joyner. It is therefore uncontroverted that Stanton had legitimate, nondiscriminatory reasons for issuing the written reprimand. The record thus reveals that any action she took to reprimand or discipline Joyner was legitimately related to business concerns and hospital policy, not grounded in discrimination.

■ Finally, when we consider the February 7 meeting at which the alleged assault and battery took place, we are faced with three discrete issues: the purpose for the meeting itself, the suspension that arose from both Joyner's attempt to depart and her actual departure (neither the attempt to depart nor the departure is disputed), and the assault and battery and false imprisonment that allegedly occurred. Although the trial court made findings of fact, which it should not have done, with respect to the latter issue, those findings do not affect the determination that there were no genuine issues of *material* fact.

In analyzing this issue, we note that it is undisputed that the reason for the meeting

was to discuss the allegations of wrongdoing leveled against Joyner in the February 3, 1997 memorandum. The memorandum stated that Joyner had violated hospital policy by soliciting a letter of commendation from the family member of a patient and by releasing confidential medical records without the required written authorization. We agree with the trial court, which observed:

> Thus, the supervisory meeting called for on February 7, 1997, and the February 3, 1997 memorandum that was to be given [Joyner] at the meeting were founded on legitimate business concerns rather than on discrimination. [Joyner], therefore, was without legal right to decline to listen to [Stanton] or to leave the meeting and, accordingly, acted insubordinately. As a result, the March 4, 1997 suspension [for insubordination] was also founded upon nondiscriminatory, legitimate business concerns. [Joyner] has failed to provide sufficient evidence that these legitimate business concerns were pretextual.

As to the alleged assault and battery at the February 7 meeting,[10] the trial court found that there was "no evidence that such an event occurred," and concluded that "there is no evidence to support the allegation that the harassment [in the form of the alleged assault and battery], if it occurred at all, was based on plaintiff's status [as a member of a protected class]." The trial court's determination that the assault and battery did not occur was another finding that it was not permitted to make. Nonetheless, whether or not the assault and battery actually occurred is

---

motion for summary judgment. *W.T. Galliher & Brother, supra* note 8, 656 A.2d at 302. However, the trial court's finding of fact on this point has no bearing on the outcome because it was a finding on a fact that was not material.

10. In this context, we consider the alleged assault and battery as possible evidence of discrimination, and not as assault and battery *per se.*

not a genuine issue of material fact. Again, a material fact is one "that has direct and uncontestable bearing on the outcome of the case." *Hill, supra* note 8, 589 A.2d at 921 n. 9 (citing *Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505). Here, the trial court concluded, as a matter of law, that there is nothing in the record to establish that the assault and battery, if it did occur, was the product of discrimination. We agree. Therefore, whether or not the assault and battery occurred is not material and does not have a "direct and uncontestable bearing on" the determination of liability. What does have a "direct and uncontestable bearing on" the question of liability, however, is whether or not, assuming the assault and battery did occur, the assailant had a discriminatory intent. Having offered no evidence to establish such intent, we conclude that the trial court's finding that the assault and battery did not occur has no bearing on the ultimate resolution of this issue. Therefore, viewing the evidence in the light most favorable to Joyner, and assuming that the assault and battery took place, Joyner failed to establish pretext.

■ In sum, appellees had the burden of articulating nondiscriminatory reasons for their actions, a burden that they satisfied. That articulation by appellees shifted the burden to Joyner to demonstrate that their actions were mere pretext to disguise a discriminatory practice. We are satisfied that she failed to offer any evidence upon which a reasonable jury could have found in her favor.[11] We, therefore, hold that the trial court correctly granted summary judgment on the discrimination count (Count VII).

### 3. Constructive Discharge

■ Joyner also contends that we should reverse the trial court's grant of summary judgment on the constructive discharge count (Count VI). " 'A constructive discharge occurs when the employer deliberately makes working conditions intolerable and drives the employee into an involuntary quit.' " *Arthur Young & Co., supra,* 631 A.2d at 362 (quoting *Atlantic Richfield Co. v. District of Columbia Comm'n on Human Rights,* 515 A.2d 1095, 1101 (D.C.1986)). The only portion of Joyner's brief addressing this issue states, in its entirety: "Genuine issues of fact exist regarding plaintiff's constructive discharge. Should this court reverse this matter because genuine issues of material facts exist for the hostile workplace claim, it follows therefrom that the same issues will demonstrate the existence of genuine

---

**11.** In an attempt to bolster her discrimination claim, Joyner asserts that Sibley created a hostile work environment, contending that others in her protected class were also harassed. In order to establish the existence of a hostile work environment, a plaintiff must establish the following:

> (1) that he is a member of a protected class, (2) that he has been subjected to unwelcome harassment, (3) that the harassment was based on membership in the protected class, and (4) that the harassment is severe and pervasive enough to affect a term, condition, or privilege of employment.

*Daka, Inc. v. Breiner,* 711 A.2d 86, 92 (D.C. 1998). However, as discussed above, Joyner failed to show that she was subjected to harassment, or that any alleged harassment was based upon her membership in a protected class. Further, she offers no evidence upon which to conclude that the reasons for the treatment to which other members of her protected class were exposed and to which she refers as "harassment" were, in fact, pretextual. Moreover, and more important, she does not address the uncontested fact that fellow employees who were not members of a protected class (*i.e.,* employees who were Caucasian and under 40 years of age) were disciplined or terminated for similar violations of workplace rules.

issues of material fact for [Joyner]'s constructive discharge claim." This is simply a variation of the argument presented on the discrimination claim. Given our holding on that claim, and Joyner's failure to submit any other arguments in support of her position, we conclude that the grant of summary judgment on the constructive discharge claim was also proper.

### 4. Intentional Infliction of Emotional Distress

With respect to the intentional infliction of emotional distress claim (Count II), as we noted *supra* note 6, there was some confusion as to whether the trial court dismissed that count without prejudice for referral to the DOES or entered summary judgment in favor of appellees on that count. We conclude, relying upon the trial court's reliance upon *Underwood, supra* note 6, 665 A.2d 621, that the court, in fact, entered summary judgment on that count. Therefore, we now consider whether the trial court erred in doing so.

■■■■ We are satisfied that there were no genuine issues of material fact and that appellees were entitled to judgment as a matter of law. Joyner never established a *prima facie* case of intentional infliction of emotional distress, the elements of which are:

(1) "extreme or outrageous conduct" which (2) "intentionally or recklessly" causes (3) "severe emotional distress to another." To establish the required degree of "outrageousness," the plaintiff must allege conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

*Kerrigan v. Britches of Georgetowne*, 705 A.2d 624, 628 (D.C.1997) (internal citations omitted). "In the employment context, we traditionally have been demanding in the proof required to support an intentional infliction of emotional distress claim." *Id.* (citations omitted). Here, as discussed *supra*, Joyner adduced no evidence to establish that appellees' actions, with the exception of the alleged assault and battery, were based on anything but legitimate business reasons. Therefore, these acts certainly do not amount to "outrageous conduct" for the purpose of establishing intentional infliction of emotional distress. *See Kerrigan, supra*, 705 A.2d at 628. Moreover, Joyner has cited no authority that intentionally closing the office door on Joyner's hand in an attempt to prevent her departure from the February 7 disciplinary meeting, even though seemingly excessive if true, by itself is sufficient to constitute intentional infliction of emotional distress, and we are aware of none. Therefore, the trial court did not err in entering summary judgment on that count.

For the reasons stated, we conclude, as did the trial judge, that summary judgment was appropriate for Joyner's claims for discrimination (Count VII), constructive discharge (Count VI), and intentional infliction of emotional distress (Count II). There were no genuine issues of material fact, and appellees were entitled to judgment as a matter of law. *See Joeckel, supra*, 793 A.2d at 1281–82.

### B. Dismissal, Without Prejudice, of the Assault and Battery Claim (Count I) and the False Imprisonment Claim (Count V) [12]

■■■ Now we turn to the trial court's dismissal of Counts I and V on primary jurisdiction grounds.

12. See note 7, *supra*.

We have held that, when there is a "substantial question" whether the WCA applies, the administrative agency charged with implementing the statute, given its special expertise, has a "primary jurisdiction" to "make the initial determination concerning coverage" before the courts can exercise jurisdiction. We elaborated that, when an injury occurs during the performance of an employee's duties, "a substantial question will exist," and thus the agency will have primary jurisdiction, "unless the injuries were *clearly* not compensable under the statute."

*Estate of Underwood, supra* note 6, 665 A.2d at 631 (quoting *Harrington v. Moss,* 407 A.2d 658, 661 (D.C.1979)) (internal punctuation and citation omitted in original). In this case, the Superior Court's jurisdiction over appellant's common law assault and battery claim and false imprisonment claim depends on whether we can say, as a matter of law, that her claims are "clearly" outside WCA coverage. *See id.*

 In her brief, Joyner asserts that the WCA does not apply to Count I, and incorporates by reference her argument from her Opposition to Defendants' Motion to Dismiss in the trial court, which opposed dismissal of both the assault and battery and the false imprisonment counts. In that Opposition, Joyner relied on *Underwood* for the proposition that her tort claims ought not to be dismissed, because they were injuries resulting from alleged discrimination under the DCHRA. Joy-

ner's argument is unavailing as there are a number of "substantial questions," *see Underwood, supra* note 6, 665 A.2d at 631, that exist regarding the applicability of the WCA to Joyner's assault and battery and false imprisonment claims. These substantial questions include: (1) uncertainty as to whether Joyner suffered the type of injury covered by the WCA; (2) whether the alleged injury occurred, if at all, in the scope of employment; [13] and (3) if the injury occurred, whether it was caused by intentional or negligent conduct. For these reasons, and because Joyner has not made a showing that Counts I and V were "clearly" outside the WCA, *see id.,* we conclude, as did the trial court, that these claims should have been brought under the primary jurisdiction of the Department of Employment Services ("DOES").

 The trial court, however, should not have dismissed the claims. Instead, the trial court should have stayed the proceeding pending the DOES's disposition of these claims.[14] *Tekle v. Foot Traffic,* 699 A.2d 410, 413 (D.C.1997) ("Because we conclude that there is a substantial question concerning the applicability of the WCA, we remand this matter to the trial court *with instructions to stay the proceeding* until Ms. Tekle has had reasonable time to present her claims to the DOES.") (emphasis added); *District of Columbia v. L.G. Indus.,* 758 A.2d 950, 956 (D.C.2000) ("Primary jurisdiction ... applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement

---

**13.** The alleged injury occurred during the course of Joyner's attempt to leave her supervisor's office during a work-related disciplinary meeting. "[A]n injury suffered from an assault *may* arise out of employment within the meaning of the [WCA] if the reason for the assault is a quarrel having its origin in work." *Harrington, supra,* 407 A.2d at 662 (emphasis added). We also note that the WCA "does not require a causal relationship between the nature of the employment and the accident."

*Id.* (citing *O'Leary v. Brown–Pacific–Maxon, Inc.,* 340 U.S. 504, 507, 71 S.Ct. 470, 95 L.Ed. 483 (1951)).

**14.** We note that in both the trial court and before us Joyner opposed dismissal, but did not request that the matter be stayed. We conclude, however, on the authority of *Tekle,* that a stay is the appropriate course of action.

of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process *is suspended* pending referral of such issues to the administrative body for its views.") (emphasis added) (internal punctuation omitted).[15]

### III. CONCLUSION

We conclude that the trial court did not err in granting summary judgment in favor of appellees on the discrimination, constructive discharge, and intentional infliction of emotional distress counts. We further conclude that the trial court properly ruled that the assault and battery count and false imprisonment count must be presented to the DOES for consideration. Outright dismissal of those counts, however, was error. Accordingly, we affirm the trial court's ruling as to the discrimination, constructive discharge, and intentional infliction of emotional distress counts, and remand the assault and battery and false imprisonment counts with instructions to stay the proceedings pending the DOES's disposition of those claims.

*So ordered.*

---

15. Although Joyner has not herself raised the point directly, there is a question as to whether the WCA applies to the separate claim against Stanton: "by definition, injuries to an employee that are intended by the employer fall outside of the WCA's exclusivity provisions, even though they are work-related, because they are nonaccidental." *Grillo v. Nat'l Bank of Washington*, 540 A.2d 743, 748 (D.C. 1988) (citations omitted); *but see* D.C.Code § 32–1504(b) (2001) ("The compensation to which an employee is entitled under this chapter shall constitute the employee's exclusive remedy against the employer, *or ... any employee ... of such employer ...* (while acting within the scope of his employment) for any illness, injury, or death arising out of and in the course of his employment ....") (emphasis added). The issue in the instant case is whether or not the injury Joyner allegedly sustained as a result of Stanton's alleged slamming of the door was intentional and if it was outside of the purview of the WCA. The very existence of that issue, however, confers primary jurisdiction upon "the administrative agency charged with implementing the statute, given its special expertise, ... 'unless the injuries were *clearly* not compensable under the statute.'" *Estate of Underwood, supra* note 6, 665 A.2d at 631 (citation omitted). Further, we note that Joyner never claimed, either in the trial court or here, that even if the WCA applied to the employer, it would not apply to the separate claims against Stanton.