Tomika HAMILTON, et al., Appellants,

v.

**HOWARD UNIVERSITY,**
et al., Appellees.

No. 06–CV–916.

District of Columbia Court of Appeals.

Argued Nov. 28, 2007.
Decided Nov. 13, 2008.

Ellen K. Renaud, with whom Richard L. Swick was on the brief, Washington, for appellants.

Musa L. Eubanks, Atlanta, GA, for appellee Howard University.

Jeanett P. Henry, Washington, for appellee Mark Furline.

Before RUIZ and FISHER, Associate Judges, and SCHWELB, Senior Judge.

FISHER, Associate Judge:

Tomika Hamilton and Jonathan Hamilton allege that Howard University Hospital and Mark Furline took adverse employment actions against their late mother, De'Borah Hamilton, for discriminatory reasons or in retaliation for opposing unlawful discrimination.[1] They also claim that the defendants violated their mother's rights under the District of Columbia Family and Medical Leave Act. The trial court granted summary judgment in favor of defendants. We affirm.

## I. Background

Our recent decision in *Furline v. Morrison*, 953 A.2d 344 (D.C.2008), issued after this case was briefed and argued, discusses many facts relevant to this appeal. *Furline* concerned another plaintiff (Cynthia Morrison) who worked in the same emergency room at Howard University Hospital, under the same supervisor (Furline), during the same period. All parties acknowledge that *Furline* dealt with "nearly identical facts," and the same law firm represented both Morrison and Hamilton. Morrison brought an action against Howard University and Furline alleging age discrimination, retaliation, and creation of a hostile work environment. Prior to trial, the court granted partial summary judgment to the defendants on the hostile work environment and age discrimination claims. *Id.* at 345–46. Morrison persuaded a jury that the defendants retaliated against her for lodging an age discrimination complaint. *Id.* at 346. Each party appealed its respective loss (except for the hostile work environment claim, which was not appealed). *Id.* We reversed the judgment entered on the jury's verdict and affirmed the trial court's grant of partial summary judgment because "no jury reasonably could attribute the upper-level decision to suspend Morrison to Furline's bias or find that the stated reason, Morrison's absence from work, was a pretext for discrimination or retaliation." *Id.* at 357–58. Because the factual underpinnings of these cases are nearly identical, we rely heavily on the narrative and analysis in *Furline*.

Hamilton worked at Howard University Hospital for approximately twenty-five years, from August 1977 until her termination on January 18, 2002. Before she was terminated, Hamilton worked as a registrar in the admitting department of the Emergency Care Area ("ECA"). In March 2001, Hamilton complained about a discriminatory message left on a computer terminal. In *Furline*, we described the facts that gave rise to this complaint:

> [T]he hospital hired Mark Furline as an ECA supervisor and some thirteen new registrars in late 2000. Most of the new hires were in their twenties. Morrison and others perceived that Furline, who

---

1. Hamilton died on August 20, 2002. Her children bring this action under D.C.Code § 12–101 (2001) (survival of rights of action).

was one of three ECA supervisors, exhibited favoritism toward the younger registrars and hostility toward the older workers. Further roiling the workplace, rumors spread that the younger workers were being paid more than the older veterans, though in fact that was not so.

On March 16, 2001, a screen saver message was left on a computer in the registrars' work area asking why the younger registrars were (supposedly) better compensated than their older, more experienced colleagues. This message came to Furline's attention and he chose to respond with a screen saver message of his own, which he placed on a computer in a registration booth frequently used by Morrison. Furline wrote that the younger employees were being paid more because "they are younger, dependable, and more productive, that's why!" Witnesses testified that Furline told them he "would like to see the expression on Ms. Morrison's face when she sees this."

*Id.* at 346.

Not surprisingly, Morrison was offended. Hamilton also found Furline's sarcasm upsetting and complained about the "disrespectful & discriminatory" message to Benjamin Zachariah, the hospital's Director of Business Operations.[2] In response to complaints about the screen saver message, Zachariah verbally reprimanded Furline. Furline apologized to the entire ECA staff, personally and in writing. There was no direct evidence that Furline knew Hamilton had complained; however, we shall assume for the sake of argument that Furline was aware or at least suspected that Hamilton had lodged an age discrimination complaint against him.

Given the nature of the services it provides, the ECA has a critical need for timely and consistent attendance by its staff. Howard University makes newly hired ECA registrars aware of the "vital expectation" of "punctuality and reliable attendance," and anyone unable to meet these expectations is "encouraged to take another position at the hospital." Nevertheless, the admitting department had serious problems with tardiness and absenteeism—"know[ing] who was going to be at work, who was showing up, who ran late, who was calling in." " 'Call-ins' by ECA registrars could cause a 'chain reaction' of disruption to ECA and hospital operations," and could leave the hospital responsible for large amounts of overtime pay.

When time and attendance problems became even more critical after an increase in patient volume, Howard University hired two new supervisors, including Mark Furline, in part to "take on the tasks of enforcing time and attendance policies among ECA registrars...." With the agreement of hospital management, the supervisors conducted a time and attendance study. They notified the staff that they would be monitoring and recording time and attendance from November 1, 2000, until January 31, 2001, and that individual staff members could be subject to disciplinary measures based on the results of the study.

"The study confirmed that problems of absenteeism, lateness, and apparent abuse of leave were widespread[.]" *Furline,* 953 A.2d at 347. In February 2001, hospital management counseled sixteen of the nineteen registrars about the need to improve

**2.** Viewing the evidence in the light most favorable to plaintiffs, as we must on a review of summary judgment, we assume that Hamilton's undated, handwritten complaint addressed "To whom it may concern" was directed to and received by Zachariah on or about March 16, 2001.

their attendance. *Id.* Hamilton was one of the sixteen employees who received counseling; three of the disciplined registrars were less than thirty years old. Howard University also issued commendations for "extraordinary adherence to time and attendance standards"; three employees (ages 41, 59, and 62) received these letters.

In addition to her job at Howard University, Hamilton also worked as an Emergency Medical Technician ("EMT") for the District of Columbia Fire Department beginning sometime in 2000. This was a full-time job, and Hamilton would return home from her shift around four or five p.m. She would sleep for a few hours before going to work at Howard University at eleven or eleven-thirty p.m. Hamilton accepted Howard University's offer to adjust her schedule so that she would start one half-hour later because she "felt that changing the shift by that 30 minutes would help her." Nevertheless, "[s]he started being late again almost immediately."

While working two full-time jobs, Hamilton also cared for her sick mother, who lived in Hamilton's house from February 2000 until late 2002. Her mother used an "oxygen machine" and needed someone in the house, but Hamilton's daughter Tomika was able to provide day-to-day care because she was not working at the time. Everyone, including Tomika Hamilton's brother Jonathan and her sister Jeymie, pitched in to care for the grandmother. On occasion Hamilton would call Furline ahead of her shift to tell him she needed to take leave because her mother was sick. However, she never made a formal request under Howard University's family leave policy, and, so far as the record discloses, she was never refused leave to care for her mother. Defendants did not count this time against her when considering her lateness and absenteeism for the time and attendance study.

Under the terms of their collective bargaining agreement, Hamilton and her fellow registrars in the ECA were subject to "progressive" discipline for absenteeism, tardiness, and excessive use of sick leave. Despite the verbal counseling, Hamilton's punctuality did not improve. On April 4, 2001, she received further verbal counseling for her continuing time and attendance problems. On May 29, 2001, Howard University issued a written reprimand which stated that "From February 1 through April 30, 2001, you have acquired an additional 24 hours of sick/annual leave and 11 instances of running late/overslept. In addition, the daily time and attendance sheets reflect[ ] you being routinely late." On September 27, 2001, the hospital notified Hamilton that she was being suspended for five days "for [her] time and attendance." On December 19, 2001, Furline and the two other ECA supervisors recommended to the Assistant Director of Human Resources that Hamilton be terminated "for her consistent abuse of unscheduled leave and tardiness." The recommendation reported that from November 2000 to December 19, 2001, Hamilton had "accumulated a total of 236 hours of unscheduled leave[,]" including 104 hours since August 1, 2001; it detailed the escalation of progressive discipline dating from February 15, 2001. Hamilton was ultimately terminated on January 18, 2002, for unsatisfactory time and attendance. She was forty-eight years old at the time.

Plaintiffs filed a lawsuit in the Superior Court, seeking damages under the District of Columbia Human Rights Act ("DCHRA") for age-based discrimination, retaliation, and a hostile work environment, as well as for violations of the District of Columbia Family and Medical Leave Act ("DCFMLA"). The court granted defendants' motion for summary judgment on all claims. It found that

plaintiffs had not established a *prima facie* case of age discrimination because they could show neither that Hamilton was similarly situated to any younger workers, nor that she was treated disparately from any younger workers who might have been similarly situated. The court also concluded that even if plaintiffs had established a *prima facie* case, defendants had articulated a legitimate, non-discriminatory reason for the adverse employment actions— "namely, that she had extensive time and attendance problems that persisted despite repeated warnings"[;] plaintiffs had proffered no evidence of pretext.

With respect to the retaliation claim, the court concluded that plaintiffs could establish that Hamilton engaged in protected activity when she complained to Zachariah[3] about the screen saver message. However, they could not establish a causal connection between the protected activity and the adverse employment actions because the events were too remote in time and Hamilton received her initial reprimand about time and attendance before she engaged in protected activity. On the DCFMLA claim,[4] defendants "produced uncontradicted evidence that Ms. Hamilton was offered [DC]FMLA leave but declined it" and that "in any event, whatever leave Ms. Hamilton took to care for her mother was not counted against her in assessing her lateness and absenteeism for the purpose of the time and attendance study."[5] This appeal followed.

## II. Standard of Review

This court reviews "the grant of a motion for summary judgment *de novo.*" *Joyner v. Sibley Memorial Hospital*, 826 A.2d 362, 368 (D.C.2003). "[T]o be entitled to summary judgment, [defendants] must demonstrate that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law." *Colbert v. Georgetown University*, 641 A.2d 469, 472 (D.C.1994) (en banc) (citing Super. Ct. Civ. R. 56(c)). While we examine the evidence in the light most favorable to the party opposing the motion, "[c]onclusory allegations by the nonmoving party are insufficient to establish a genuine issue of material fact or to defeat the entry of summary judgment." *Hollins v. Federal National Mortgage Association*, 760 A.2d 563, 570 (D.C.2000) (citation omitted). The question is "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party [with the burden of proof]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal quotation marks and citations omitted).

## III. The DCHRA Claims

The DCHRA makes it "unlawful" for an employer to discharge an employee

---

**3.** But see *supra* note 2.

**4.** We do not understand plaintiffs to allege retaliation prohibited by the DCFMLA. *See* D.C.Code § 32–507(b) (2001). While the complaint itself is unclear on this issue, plaintiffs' opposition to summary judgment and their appellate briefs clarify that they believe Howard University "fail[ed] to apprise [Hamilton] of her rights" under D.C.Code § 32–502(a)(4) (2001).

**5.** The court addressed the hostile work environment claim in a separate order, granting summary judgment because the plaintiffs had offered only evidence of favoritism, not harassment, citing *Ritchie v. Dep't of State Police*, 60 Mass.App.Ct. 655, 805 N.E.2d 54, 60–61 (2004), and because they had not shown "anything resembling a severe and pervasive environment of hostility or harassment based on Ms. Hamilton's age." Plaintiffs have not addressed this issue on appeal and thus we consider it waived. *Cf. Wagner v. Georgetown University Medical Center*, 768 A.2d 546, 554 n. 9 (D.C.2001) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived....").

based on age, among other reasons. D.C.Code § 2–1402.11(a)(1) (2007 Repl. Vol.). "The DCHRA also makes it unlawful [for an employer] to retaliate against an employee for opposing an employment practice that is prohibited by the Act." *Furline*, 953 A.2d at 352; D.C.Code § 2–1402.11(a) (2007 Repl.Vol.); D.C.Code § 2–1402.61(a) (2007 Repl.Vol.); *Vogel v. District of Columbia Office of Planning*, 944 A.2d 456, 463, 463 n. 12 (D.C.2008).[6] "In considering claims of discrimination under the DCHRA, we employ the same three-part, burden-shifting test articulated by the Supreme Court for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Hollins*, 760 A.2d at 571 (citations omitted); *see McFarland v. George Washington University*, 935 A.2d 337, 346 (D.C.2007). When doing so, we must remember that " '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Id.* at 346 (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)) (additional internal quotation marks and citation omitted).

■ Since Howard University produced evidence that it suspended and terminated Hamilton for a legitimate, non-discrimina-

tory reason, we need not analyze whether plaintiffs made out a *prima facie* case of retaliation or age discrimination. *See Furline*, 953 A.2d at 352–53. Instead, we may move to the ultimate question of whether Hamilton offered sufficient evidence for a reasonable "jury to find that retaliation or age discrimination 'actually motivated the employer's decision.' " *Id.* at 353 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). "[T]he emphasis is on the need for *evidence*: 'As courts are not free to second-guess an employer's business judgment, a plaintiff's mere speculations are insufficient to create a genuine issue of fact regarding [an employer's] articulated reasons for [its decisions]....' " *Id.* at 354 (quoting *Brown v. Brody*, 339 U.S.App. D.C. 233, 245–46, 199 F.3d 446, 458–59 (1999)) (emphasis in original).

Pointing to Furline's "ageist" screen saver comment, plaintiffs suggest that the evidence is sufficient to raise an inference of discrimination. They say that Furline socialized with the younger workers and ignored their tardiness and absences.[7] They also assert that Furline "punished" older employees by charging them with insubordination, requiring "fitness for duty" examinations, and giving them "more difficult work." In addition, he

---

**6.** As we did in *Furline*, 953 A.2d at 352 n. 24, we consider Hamilton's discrimination and retaliation claims together:

Broadly speaking, to state a *prima facie* claim of disparate treatment discrimination, the plaintiff must establish that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. Analogously, [a]n employee may make out a *prima facie* case of retaliation by demonstrating that: (1) she engaged in a protected activity by opposing or complaining about employment practices that are unlawful under the

DCHRA; (2) her employer took an adverse personnel action against her; and (3) there existed a causal connection between the protected activity and the adverse personnel action.

*Id.* (internal citation and quotation marks omitted).

**7.** We find no support in the record for plaintiffs' assertion that Furline "instruct[ed]" younger workers to report their absenteeism inaccurately. The record was more accurately characterized in *Furline*, where we referred to evidence that Furline "was indulgent when [younger employees] took long lunches and were late for work...." 953 A.2d at 350 n. 7.

tried to withhold one of Hamilton's paychecks. In response to Howard University's stated justification for termination, they claim that "flaws" in the time and attendance study slanted it in favor of younger workers by ignoring their tardiness and absences. Crucially, however, they do not list among the study's alleged flaws any significant errors in the recording of Hamilton's own absences or tardiness.[8] Nor did Howard University compare her attendance record to those of any other workers in arriving at the decision to terminate. The recommendation to terminate, "the next step in progressive disciplinary action[,]" was based on Hamilton's accumulation of "a total of 236 hours of unscheduled leave[,]" and was made only after Hamilton incurred "an additional 104 hours of unscheduled leave" between August 1 and December 19, 2001 (the evaluation period which followed the one on which the suspension was based).

Although the facts in this case are slightly different from those presented in *Furline*, plaintiffs themselves note that *Furline* was decided on "nearly identical facts" and that, at least with respect to the retaliation claim, the result "should not differ here." We agree. The record in this case contains no evidence of discrimination or retaliation sufficient to stave off summary judgment, and because of the similarity in the cases, we rely heavily on the *Furline* decision.

■ As in *Furline*, the salient fact in this case is that neither Furline, his fellow supervisors, nor their immediate superior (Lydia Mason, who assumed Zachariah's oversight role above the supervisors in July 2001) were the decision makers.[9] We are satisfied that the decisions to suspend and to terminate Hamilton were at least as far insulated from Furline as was the decision to suspend at issue in *Furline*.

In *Furline*, the decision was made "by the Assistant Director of Human Resources in conjunction with other senior officials." *See Furline*, 953 A.2d at 354. In our case, all three supervisors made a recommendation to terminate Ms. Hamilton. This recommendation was reviewed by Sonya Chavis, who held a pre-termination meeting with Hamilton. Hamilton, her attorney, Furline, Mason, and Chavis attended the meeting, and Hamilton was given "a chance to explain [her] time and attendance." Hamilton claimed she had

8. Plaintiffs cite the records from April 11, 2001, as proof of the study's flaws. The monthly time and attendance study indicates that Hamilton was absent for the entire shift while the daily time and attendance report asserts that she worked from "00:20" until "6:24." Hamilton had the opportunity to raise this issue in response to the written reprimand on May 29, 2001 (the reprimand addressing the period between February 1, 2001, and April 30, 2001), or in any subsequent letter or hearings. No evidence suggests that she did so. Furthermore, the written reprimand suggests that any conflict may have been resolved in her favor. The formal reprimand faults her for twenty-four hours of sick or annual leave, and eleven instances of tardiness between February 1, 2001, and April 30, 2001. However, the monthly time and attendance reports indicate sixty-four hours of sick or annual leave, and eleven instances of tardiness during the same period. In any event, plaintiffs concede that Hamilton was tardy on April 11, 2001, and any error in documentation on that date is immaterial in comparison to the vast amount of evidence showing her persistent attendance problems.

9. We assume, for the sake of argument, that the evidence was sufficient to demonstrate that Furline recommended Hamilton's termination, at least in part, for retaliatory or discriminatory reasons. *See Furline*, 953 A.2d at 354. We also assume that Furline was " 'acting in the interest of' Howard University, and hence that he falls within the definition of an 'employer' contained in the DCHRA." *Id.* (citing D.C.Code § 2–1401.02(10) (2007 Repl. Vol.)).

not received verbal counseling or a written reprimand, and that her suspension was imposed without the requisite pre-suspension meeting. Chavis determined that these claims were untrue, but nevertheless recommended that Hamilton not be terminated out of concern for the hospital's compliance with the DCFMLA. The record was next reviewed by the Assistant Director of Human Resources, and then by the Chief Operating Officer. While the practice of the Chief Operating Officer was to seek more information if she had a question or thought that the hospital needed it, in this case she found the record sufficient to simply terminate Hamilton.

As in *Furline*, plaintiffs have made no record to show "that either (1) the actual decisionmakers had retaliatory or discriminatory reasons for suspending her, or (2) their decision was tainted by Furline's involvement or influence." 953 A.2d at 354. They have not shown that the documentation of Hamilton's absences or tardiness is materially inaccurate. From all that appears, Hamilton's termination was the fully justified result of excessive, unexcused absence from work. *Id.* (Plaintiffs presented no evidence that the Hospital refrained from terminating similarly situated younger workers.) Because the facts surrounding these claims are substantially similar to those addressed in *Furline*—indeed, where they differ, the facts here weigh more heavily in favor of Howard

University—we do not need to prolong our legal analysis. We refer to and adopt the *Furline* court's rejection of the "subordinate bias theory" and similarly dispose of these claims. *Id.* at 354–58.[10]

As we stated in *Furline*, "[a]s far as the evidence shows, senior officials decided that [Hamilton's termination] was warranted based solely on an independent review of the charges against her, and only after hearing her side of the story." 953 A.2d at 357. "On this record, no jury reasonably could attribute the upper-level decision to [terminate Hamilton] to Furline's bias or find that the stated reason, [Hamilton's] absence from work, was a pretext for discrimination or retaliation." *Id.* at 357–58.

## IV. The DCFMLA Claim

The DCFMLA provides, among other things, that "[a]n employee shall be entitled to a total of 16 workweeks of family leave during any 24–month period for . . . [t]he care of a family member of the employee who has a serious health condition." D.C.Code § 32–502(a)(4) (2001). Subject to some limitations, "in the case of a family member who has a serious health condition, the family leave may be taken intermittently when medically necessary." D.C.Code § 32–502(c) (2001).[11] However, the employee must request such leave. "Under the applicable regulations, employees must notify their employers of their

---

**10.** We reach the same conclusion with respect to the five-day suspension of Hamilton. Furline and his fellow supervisors did not have the authority to suspend an employee; their recommendation had to be reviewed by the Human Resources department. Hamilton's appeal of this suspension was denied.

**11.** It is not clear whether (and if so at what times) Hamilton met the requirements for taking DCFMLA leave to care for her mother. Establishing eligibility would require a showing that she needed leave to "care [for] a family member . . . who has a serious health

condition." D.C.Code § 32–502(a)(4) (2001). The statute defines a "[s]erious health condition" as "a physical or mental illness, injury, or impairment that involves: (A) Inpatient care in a hospital, hospice, or residential health care facility; or (B) Continuing treatment or supervision at home by a health care provider or other competent individual." D.C.Code § 32–501(9) (2001). We assume for the sake of argument that plaintiffs have presented enough evidence to create a genuine issue of material fact with respect to this element of their proof.

desire to take medical leave (1) 'as soon as possible prior to the date on which the employee wishes the leave to begin' when the need for leave was not reasonably foreseeable at least thirty days in advance, 4 DCMR § 1608.2, or (2) 'not later than two (2) business days after the absence begins' if an emergency 'prevents an employee from notifying the employer of the need for [family or] medical leave prior to the first day of absence. . . .' 4 DCMR § 1608.3." *Harrison v. Children's National Medical Center,* 678 A.2d 572, 577 n. 12 (D.C.1996).

In *Washington Convention Center Authority v. Johnson,* 953 A.2d 1064 (D.C. 2008), we noted that there were two main theories for recovery under the DCFMLA: "the retaliation or discrimination theory and the entitlement or interference theory." *Id.* at 1075–76.

> The retaliation or discrimination theory arises from D.C.Code § 32–507(b), which, among other things, makes it "unlawful for an employer to discharge or discriminate in any manner against any person because the person . . . [o]pposes any practice made unlawful by this chapter." D.C.Code § 32–507(b)(1) (2001). The entitlement or interference theory is based upon D.C.Code § 32–507(a), which provides that "[i]t shall be unlawful for any person to interfere with, restrain, or deny the exercise of or the attempt to exercise any right provided by this chapter. . . ." "If an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a deprivation of this right is a violation regardless of the employer's intent." *Smith* [*v. Diffee Ford–Lincoln–Mercury, Inc.*], 298 F.3d [955,] 960 [(10th Cir.2002)]; *see also Col-*

*burn v. Parker Hannifin/Nichols Portland Div.,* 429 F.3d 325, 331 (1st Cir. 2005) ("no showing as to employer intent is required"). . . .

*Id.* at 1076 (footnote and citations omitted). Plaintiffs' claim seems to be based on an entitlement theory because they have not argued, and certainly have not proffered evidence to demonstrate, that Hamilton "[o]ppose[d] any practice made unlawful by" the DCFMLA. *See* D.C.Code § 32–507(b)(1) (2001).

As best we can tell, plaintiffs' claim has two components: (1) that Howard University interfered with Hamilton's right to take intermittent family leave because absences to care for her mother were counted when the hospital decided to terminate her, and (2) that Howard University failed to advise Hamilton of her rights under the DCFMLA. *See* D.C.Code § 32–511 (2001). Even assuming for the sake of argument that both of these theories identify valid claims under the DCFMLA, *see Conoshenti v. Public Service Electric & Gas Co.,* 364 F.3d 135, 142 (3d Cir.2004) (recognizing "failure to advise" theory of recovery); *Kosakow v. New Rochelle Radiology Associates, P.C.,* 274 F.3d 706, 723 (2d Cir.2001) (noting, but not deciding validity of, case law holding that, "under the proper circumstances, a distinct cause of action lies for an employer's failure to post a notice where that failure leads to some injury"), plaintiffs failed to produce competent evidence to support their claim. Therefore, defendants were entitled to judgment as a matter of law.[12]

### A. Plaintiffs Were Required to Proffer Competent Evidence

When a trial court considers a motion for summary judgment, it must

---

12. Given our disposition of this claim, we need not decide whether Furline is subject to individual liability under the DCFMLA.

view all evidence and inferences from that evidence in the light most favorable to the non-moving party. Nevertheless, once the moving party has carried its initial burden, "[t]he opposition [to summary judgment] must consist of more than conclusory allegations, and be supported by affidavits or other competent evidence tending to prove disputed material issues of fact." *Estenos v. PAHO/WHO Federal Credit Union,* 952 A.2d 878, 892 (D.C.2008). The party opposing the motion for summary judgment must offer "competent evidence admissible at trial showing that there is a genuine issue as to a material fact." *Sanchez v. Magafan,* 892 A.2d 1130, 1132 (D.C.2006) (quoting *Hill v. White,* 589 A.2d 918, 921 (D.C.1991) (citations and internal quotation marks omitted)). *Accord, Nader v. de Toledano,* 408 A.2d 31, 48 (D.C.1979) ("Summary judgment should be granted to the movant unless the opposing party offers competent evidence admissible at trial showing that there is a genuine issue as to a material fact."). Plaintiffs understandably are handicapped in meeting their burden because Ms. Hamilton died before the complaint was filed and her testimony was not preserved in a deposition.

## B. What Absences Were Counted?

The plaintiffs produced no evidence to establish that, when assessing Hamilton's time and attendance record, defendants included periods when she was caring for her mother.[13] By contrast, defendants presented the affidavits of two supervisors who stated that any leave Ms. Hamilton took to care for her mother was not included in their termination decision. As the trial court concluded, plaintiffs had not

properly disputed the defendants' evidence that "whatever leave Ms. Hamilton took to care for her mother was not counted against her in assessing her lateness and absenteeism for the purpose of the time and attendance study." Therefore, this component of plaintiffs' claim must fail.

## C. Did the Hospital Fail to Post Notice?

The DCFMLA requires the Mayor to "devise, and an employer [to] post and maintain in a conspicuous place, a notice that sets forth excerpts from or summaries of the pertinent provisions of this chapter and information that pertains to the filing of a complaint under this chapter." D.C.Code § 32–511(a) (2001). The District's regulations reaffirm this notice requirement, stating that "[e]mployers shall conspicuously post and maintain a copy of the notice to employees providing pertinent information on the act as required by [the statute]." 4 DCMR § 1602.3 (1995). We have explained that this is "[t]he sole notice requirement applicable to employers ..." in the DCFMLA. *Harrison,* 678 A.2d at 577. Plaintiffs offered no evidence that the hospital failed to fulfill this obligation.

■ Nevertheless, plaintiffs assert that the evidence created factual issues "as to whether HUH violated the FMLA by knowing of Hamilton's need for FMLA leave, but failing to apprise her of her rights...." Their argument wrongly presupposes that the hospital had obligations to give notice more targeted to a specific employee than the general posting required by the District of Columbia's statute or regulations.[14]

---

13. Here, we assume for the sake of argument that it would have violated the statute to count these absences even though Hamilton had not formally requested DCFMLA leave.

14. It is true that regulations implementing the federal FMLA have created additional requirements for individualized notice, *see* 29 C.F.R. § 825.301, but there is no comparable provision in District of Columbia regulations.

Plaintiffs rely upon statements by Sonya Chavis, the Employee and Labor Relations Specialist, who feared that Hamilton had not been notified of her rights under the DCFMLA. Chavis's January 8, 2002, memorandum recommending that Hamilton not be terminated states, in relevant part, that:

> After hearing about Ms. Hamilton's situation, I was concerned that Ms. Hamilton may have been eligible for Family & Medical Leave, especially since her supervisors were aware that her absences and lateness were due to her mother being ill. [The Howard University FMLA Administrator told me] that Ms. Hamilton had an FMLA qualifying reason or condition and that her supervisors should have either informed Human Resources or advised Ms. Hamilton to come to Human Resources. Since this was not done and Ms. Hamilton was not apprised of her rights under FMLA, I believe that if we terminate Ms. Hamilton, we could open ourselves up to liability. Accordingly, I do not recommend that Ms. Hamilton be terminated.

Chavis's deposition testimony adds nothing of evidentiary value on this topic.

The Chavis memorandum shows only that she *did not believe that* Hamilton had been individually told of her rights under the DCFMLA. It does not suggest that the hospital failed to post the required notice. (Indeed, it is not even competent evidence that Hamilton's supervisors failed to tell her about her DCFMLA rights.) [15] As the trial court properly concluded, "[w]hat matters ... is not whether an official at Howard University *thinks* there might be a[n] FMLA violation, but whether plaintiffs have presented sufficient evidence of an FMLA violation, viewed in a light most favorable to the plaintiff, to raise a genuine issue of fact. Here, plaintiffs have not done so." There was no competent evidence that defendants violated the DCFMLA, and the trial court properly granted summary judgment on this claim as well.

\* \* \* \*

For the reasons discussed, the judgment of the Superior Court is hereby

*Affirmed.*

Plaintiffs have based their claims exclusively on District of Columbia law, and we express no opinion on obligations that might arise under the federal statute and regulations.

15. Plaintiffs offered no evidence that Hamilton applied for FMLA leave, and it appears that she did not do so. Moreover, one witness was "almost sure" that Hamilton declined an offer of DCFMLA leave to care for her mother. This testimony may be inconclusive, but there was no competent evidence to the contrary. More importantly, any uncertainty on these questions does not affect our conclusion that plaintiffs proffered no competent evidence that the hospital failed to post the required notice of DCFMLA rights.