Lorendanna LUHRS, Plaintiff,

v.

NEWDAY, LLC t/a Nathans and Sam & Harry's Restaurant Holding, LLC t/a S & H Restaurant Management, Defendants.

No. CIV.A. 03–74(RMC).

United States District Court, District of Columbia.

July 9, 2004.

---

11. An Order consistent with this Memorandum Opinion will be issued contemporaneously herewith.

Robert N. Levin, Robert N. Levin, PC, Rockville, MD, for Plaintiff.

Alison N. Davis, Krupin O'Brien LL, Gary L. Lieber, Anessa Abrams, Schmeltzer, Aptaker & Shepard, P.C., Washington, DC, for Defendants.

## MEMORANDUM OPINION

COLLYER, District Judge.

Lorendanna Luhrs is a professional chef who worked at Nathans, a Georgetown restaurant, for approximately twenty-seven years. In 2002, she was separated from employment—the parties disagree as to whether she quit or was fired—when she refused to accept revised work hours proffered by new management. Ms. Luhrs sues Newday, LLC, the owner of Nathans, and Sam & Harry's Restaurant Holding, LLC (S & H), which managed Nathans' day-to-day operations during the relevant time period, alleging that she is the victim of gender and age discrimination under the District of Columbia Human Rights Act (DCHRA), D.C. CODE ANN. § 2–1401 *et seq.* The defendants bring separate motions for summary judgment at the close of discovery. Ms. Luhrs opposes these motions.

Having carefully considered the parties' briefs, argument before the Court on January 5, 2004, and the entire record, the Court finds that the motions are persuasive. Summary judgment will be granted in favor of the defendants and this case will be dismissed.[1]

## I.

Ms. Luhrs began her employment at Nathans in the summer of 1975 or 1976 as a cook, working from 3:00 p.m. to 11:00 p.m. Thereafter, she became lunch cook and worked from 8:30 a.m. or 9:00 a.m. to 3:00 p.m. She made it clear to the owners of Nathans that she did not want to work at night because of family responsibilities, although she did work evening shifts when needed. After a few years, Ms. Luhrs left Nathans to care for her children. She returned to the restaurant on a part-time basis (one to two shifts per week) for two to three years before she eventually returned to work full time. From 1993 to 1997, Ms. Luhrs was the head cook, work-

---

1. A third motion, S & H's motion to strike, will be denied as moot.

ing from approximately 8:00 a.m. to 3:00 or 4:00 p.m.

Nathans was owned and run by Carol Joynt's late husband until 1997, when he died; Ms. Joynt became the owner and president of Nathans and involved in the management of the business only after her husband's death. In 1999, she asked Ms. Luhrs to assume the "kitchen chef manager" position. Ms. Luhrs agreed. There is some uncertainty as to whether Ms. Luhrs's schedule at that time was intended to be four or five days a week. As it turned out, however, she actually worked five days a week from 7:30 a.m. or 8:00 a.m. to 6:00 p.m. or 6:30 p.m. After a year, she decided that she needed to spend more time with her family. Ms. Joynt and Ms. Luhrs agreed to a different schedule whereby Ms. Luhrs worked four days each week, remaining responsible for both lunch and dinner.

In August 2001, S & H entered into a management contract with Ms. Joynt to run Nathans.[2] S & H analyzed the restaurant's finances and determined that Nathans lost approximately $300 per lunch shift. S & H also forecast an increase in dinner sales by ten percent if lunch were eliminated. Accordingly, sometime in September 2001, Nathans ceased serving lunch.

For some time after Nathans dropped lunch from its menu, Ms. Luhrs maintained her prior hours—approximately 8:30 a.m. to 6:30 p.m.—despite the fact that she was responsible for dinner and there was no other head chef in the kitchen during these hours.[3] By January 2002, the general manager of Nathans, Stuart Drake, decided that it was necessary to revise Ms. Luhrs's schedule so that she would be at the restaurant to oversee the one meal served during weekdays. Mr. Drake met with Ms. Luhrs sometime in mid-January 2002 and asked her if "she would be able to match her kitchen manager hours up better, in fact, more appropriately with the needs of the Restaurant since [Nathans] was no longer open for lunch." Drake. Dep. at 20. Mr. Drake requested that Ms. Luhrs work from approximately 10 a.m. to 10 p.m., four days a week and one shift per weekend. Pl.'s Mem. of Pts. and Auths. in Opp. to Defs' Mots. for Summ. J. (Pl.'s Opp.) at 4. Ms. Luhrs responded that she did not know if she could work an evening schedule. She then went on vacation.[4]

Mr. Drake and Ms. Luhrs met again at the end of January to discuss her schedule. Ms. Luhrs told Mr. Drake that her family commitments prevented her from changing her hours or working evenings. On February 1, 2002, Mr. Drake informed Ms. Luhrs that he had hired someone to take over the head kitchen manager position. The parties dispute whether he fired her during this meeting or later offered her the opportunity to work in a lesser capacity, which she refused. For purposes of the motion for summary judgment, the Court will assume that Ms. Luhrs was discharged on February 1, 2002. She worked another two weeks and left Nathans without any severance pay.

2. The relationship between S & H and Nathans was terminated as of June 1, 2003.

3. Ms. Luhrs asserts that "[s]he was always on call should she be needed [at dinner]." Pl.'s Counterst. of Facts Which Demonstr. the Need for Litig. Purs. to Loc. R. 7.1(h) I (Pl.'s Counterst. I) ¶ 21.

4. Nathans asserts that "Mr. Drake told plaintiff that if she was unwilling to fully accept the change in hours, the Restaurant could possibly create a part-time prep cook position for plaintiff." Def. Nathans' St. of Mat. Facts as to Which There is No Gen. Dispute ¶ 26. Ms. Luhrs states that "Defendants never offered Plaintiff a different position." Pl.'s Counterst. I ¶ 26.

The new management by Sam & Harry led to other changes in the restaurant personnel. Ms. Luhrs asserts that all five pre-existing managers were over 40 years old and all were replaced with younger, presumably less expensive, workers. Ms. Luhrs herself was replaced by a younger male who was willing to work the hours requested. The former general manager at Nathans, a woman, was replaced by Mr. Drake, who was already an employee of S & H and who was approximately the same age. The former bookkeeper at Nathans quit her job after her duties were transferred to S & H's corporate office. One male former manager was terminated in January 2002 for drinking on the job. A second male manager voluntary left Nathans in February 2002. It would appear that these three women and two men were replaced by younger men or women, although the exact difference in ages is not certain.

## II.

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). This procedural device is not a "disfavored legal shortcut" but a fair and efficient method of resolving cases expeditiously. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether a genuine issue of material fact exists, the Court must view all facts and reasonable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C.Cir.1994). Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.... [S]ummary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

*Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

"The parties are agreed that the order and allocation of proof in this action is that set out in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)[.]" Pl.'s Opp. at 2; *see also Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23, 26 n. 1 (D.C.Cir.1997). Under this framework, the plaintiff must first establish a *prima facie* case of discrimination. The employer must then "produce admissible evidence that, if believed, would establish that the employer's action was motivated by a legitimate, nondiscriminatory reason." *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1151 (D.C.Cir.2004). Upon meeting this burden of production, the sole remaining issue is "discrimination *vel non.*" *United States Postal Bd. of Governors v. Aikens*, 460 U.S. 711, 714, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). "The plaintiff—once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision—must be afforded the 'opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

## III.

█ After twenty-seven years of increasing positions of responsibility in the

kitchen at Nathans, it is no surprise that Ms. Luhrs believes her termination was deeply unfair. She may indeed have grounds to cry foul, but her claim that her employer intentionally discriminated against her on the basis of gender and age lacks sufficient evidentiary support to survive a motion for summary judgment. Ms. Luhrs's discontent with S & H's management policies *vis-a-vis* her new hours, which resulted in her separation from employment, is not a proper basis for a lawsuit under the DCHRA. For better or worse, the DCHRA is not meant to cure all employment grievances; its limited— albeit important—purpose is "to secure an end in the District of Columbia to discrimination for any reason other than that of individual merit[.]" D.C. CODE § 2–1401.01.

■ In a nutshell, the defendants argue that summary judgment in their favor is appropriate because Ms. Luhrs refused to work the new schedule proffered by S & H, a fact that she does not dispute. Pl.'s Counterst. I ¶ 34. Her decision has two important consequences under the *McDonnell Douglas* burden-shifting scheme. First, it means that Ms. Luhrs has not established a *prima facie* case of discrimination. *See United Mine Workers of Am. v. Moore*, 717 A.2d 332, 338 (D.C. 1998) ("A *prima facie* case may be made by demonstrating[, *inter alia*,] that: '. . . she was qualified for the [position or] promotion . . . .'" (citation omitted)). Her unwillingness to work the required hours

rendered her unqualified for the head chef position. *See, e.g., Whitson v. Marriott Pavilion Hotel*, No. 4:00CV1528DDN, 2002 WL 227169, at *3, 2002 U.S. Dist. LEXIS 22796, at *8 (E.D.Mo. Jan.8, 2002) ("[Plaintiff] cannot establish a prima facie case of age discrimination, because, by his own admission, he was unwilling to work weekends or on a rotational schedule."); *Fong Chi v. Age Group, Ltd.*, No. 94Civ.5253(AGS), 1996 WL 627580, at *5, 1996 U.S. Dist. LEXIS 16075, at *15 (S.D.N.Y. Oct. 29, 1996) (holding that an employee was not qualified when she "testified that she was not willing to work late on a regular basis, and would work only what she perceived to be 'regular working hours.'"); *see also Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 765 (7th Cir.2001) ("What the qualifications for a position are, even if those qualifications change, is a business decision, one courts should not interfere with. We do not tell employers what the requirements for a job must be." (citation omitted)).

In addition, Ms. Luhrs's rejection of S & H's revised work schedule provides the defendants with "a legitimate non-discriminatory reason for the cessation of [her] employment."[5] Def. Nathans' St. of Pts. and Auths. in Supp. of Its Mot. for Summ. J. (Def. Nathans' Mot.) at 16. The defendants assert that S & H made a business decision to stop serving lunch, given that Nathans lost approximately $300 for each such shift. As a result, S & H thought it

---

5. Ms. Luhrs argues that the defendants must prove that there was a "business necessity" behind S & H's request that she modify her working hours. *See* D.C. CODE § 2–1401.03(a) ("Any practice which has a discriminatory effect and which would otherwise be prohibited by this chapter shall not be deemed unlawful if it can be established that such practice is not intentionally devised or operated to contravene the prohibitions of this chapter and can be justified by business

necessity."). However, this is not a case in which the defendants admit their discriminatory conduct but seek an exception from liability due to a business necessity. *See Joel Truitt Mgmt., Inc. v. District of Columbia Comm'n on Human Rights*, 646 A.2d 1007, 1009–10 (D.C.1994). The defendants here contend that they did not impermissibly discriminate against Ms. Luhrs in the first place and hence do not attempt to invoke § 2–1401.03(a).

sensible to modify the head chef's schedule so that she would be present at the restaurant for the entire dinner session. Ms. Luhrs was free to accept the new hours and remain on the job. Her refusal to work the new schedule was the direct cause of her separation from employment.

Ms. Luhrs counters that the defendants' explanation for the change in her work schedule is pretextual; she argues that they really sought to replace her and other managers with younger employees to whom they could pay less.[6] According to Ms. Luhrs, "[m]anagement has simply not made a showing that its position makes any sense." Pl.'s Opp. at 8. She argues that her presence during the dinner shift was unnecessary because "[s]he spent most of her time doing [preparatory] tasks rather than supervising the work of other people in the kitchen." *Id.* at 5. She notes that, "[i]f she stopped coming in early in the morning, Defendants would have had to hire someone with her skills to come in and do the jobs she had been doing." *Id.* at 4. Ms. Luhrs also asserts that the new schedule would have required Nathans to pay her 20 hours of overtime per week, "which totally destroys any claim that the change in her schedule would have been cost saving." *Id.* at 8–9. These points arguably raise questions about the reasonableness of S & H's new work schedule, which open the door to the possibility that the change was actually a cover for the defendants' true desire to remove an older employee(s). However, Ms. Luhrs fails to complete the thought by demonstrating that age (or gender) discrimination was the defendants' goal. Indeed, Ms. Luhrs admits that she has no evidence that anyone at Nathans made any derogatory comments or statements regarding a person's age (or gender) at the restaurant, and she never even complained about discrimination prior to the filing of this lawsuit. Pl.'s Counterst. I ¶¶ 39–40.

Ms. Luhrs's first piece of "evidence" to support her allegations really amounts to speculation. Her personal opinion that she would not have been retained even if she had agreed to change her hours, *see id.* ¶ 53, is insufficient to create a triable issue. *See Brown v. Brody*, 199 F.3d 446, 458–59 (D.C.Cir.1999). Had Ms. Luhrs been terminated after adopting S & H's revised schedule for the head chef position, then her lawsuit might have merit because the defendants would no longer have a legitimate, nondiscriminatory reason for the adverse employment action—*i.e.*, they could not say they fired her because she refused to work the required hours. This is not the case here. Having refused to work the required hours, Ms. Luhrs is left without an evidentiary basis to support her contention that the defendants would have unlawfully terminated her even if she had accepted the changed schedule.

Ms. Luhrs's other piece of "evidence" also fails to support her case. The fact that four other managers who worked with Ms. Luhrs also have parted ways with the restaurant does not, by itself, give rise to an inference of age (or gender) discrimination. It is undisputed that, of these four, one position was transferred to S & H's corporate office, another manager voluntarily quit, and the general manager was replaced by someone of the same approximate age. (Moreover, two of the four were male.) Without even venturing into the issue of whether such a limited sample eviscerates the value of this statistical evi-

---

**6.** Ms. Luhrs's brief does not address why she believes her alleged termination was based on gender. Although the following analysis ap- plies to both discrimination claims, the Court finds that Ms. Luhrs has abandoned her alle- gations of gender discrimination.

dence,[7] the present data before the Court hardly indicates disparate treatment or effect.

█ Finally, Ms. Luhrs asserts that "[r]eplacing older, more expensive workers, with younger, less expensive workers is usually the reason for age discrimination and it clearly was here." Pl.'s Counterst. I ¶ 28. This argument combines age and salary as if they were tokens for each other. That is not the law. Terminating a highly-paid employee to reduce costs (or increase profits) "does not in itself support an inference of age discrimination." *Bialas v. Greyhound Lines, Inc.*, 59 F.3d 759 (8th Cir.1995). A plaintiff cannot "prove age discrimination even if [she] was fired simply because [her employer] desired to reduce its salary costs by discharging [her]." *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1126 (7th Cir.1994). An employee's age is analytically distinct from her salary, even though the two are often correlated. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993); *see also Dunaway v. Int'l Bhd. of Teamsters*, 310 F.3d 758 (D.C.Cir.2002). In this case, the defendants could replace a more expensive (at-will) employee (who happened to be older) with someone less expensive (who happened to be younger) without running afoul of the DCHRA's prohibition of age discrimination. Ms. Luhrs does not allege that she was "deprived of employment on the basis of inaccurate and stigmatizing stereotypes"—*i.e.*, a belief that her productivity or competence had declined due to her age. *Hazen Paper Co.*, 507 U.S. at 610, 113 S.Ct. 1701.

### IV.

The record leads to one conclusion: neither Ms. Luhrs's age nor her gender was a motivating factor in her separation from Nathans. The defendants' motions for summary judgment will be granted, S & H's motion to strike will be denied as moot, and the complaint will be dismissed. A separate order accompanies this memorandum opinion.

---

**7.** The defendants note that there have been 35 terminations in total, "approximately half of which were male and younger than Plaintiff."

Def. S & H's Mem. in Supp. of Mot. for Summ. J. (Def. S & H's Mot.) at 9.