**Bonnie J. CAIN, Appellant,**

v.

**Victor REINOSO, et al., Appellees.**

No. 11–CV–249.

District of Columbia Court of Appeals.

Argued April 5, 2012.

Decided May 10, 2012.

John P. Racin, with whom James R. Klimaski and Lynn I. Miller, Washington, were on the brief, for appellant.

Carl J. Schifferle, Assistant Attorney General, with whom Irvin B. Nathan, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for appellees.

Before GLICKMAN and BECKWITH, Associate Judges, and FERREN, Senior Judge.

FERREN, Senior Judge:

In this suit claiming compensatory and punitive damages for age discrimination, the plaintiff-appellant, Bonnie Cain, appeals the trial court's order granting summary judgment for the appellees, Deputy Mayor Victor Reinoso and the District of Columbia. The incidents at issue arose after the mayoral election of 2007 and the subsequent passage of the Public Education Reform Amendment Act of 2007.[1] Cain had worked on behalf of Mayor Adrian Fenty's campaign, and Reinoso—newly named though not yet confirmed as Deputy Mayor for Education—hired her on January 7, 2007, as an education policy analyst (formally titled a "Special Assistant to the Deputy Mayor").[2] Cain remained in that position at the Office of the Deputy Mayor for Education (ODME) for nearly one year until December 14, 2007, when, at age sixty-two, she was discharged by Reinoso. She alleges that, in terminating her employment, Reinoso violated the District of Columbia Human Rights Act (DCHRA).[3] She argues that she has established a *prima facie* case and rebutted appellees' pretextual explanation for retaining a younger special assistant instead of her during a period of downsizing at

---

1. D.C.Code § 38–171 (Supp.2011).

2. Reinoso testified on deposition that he had hired Cain after individuals involved in the Fenty campaign had encouraged him to "consider" employing her. Cain had provided him with position papers and helped with the management of town halls during the campaign. Reinoso further testified that he had had reservations about hiring Cain but had decided to "let her work speak for itself."

3. D.C.Code § 2–1402.11(a)(1) (2007); *see* *Washington Convention Ctr. Auth. v. Johnson,* 953 A.2d 1064, 1072 (D.C.2008) (DCHRA "prohibits an employer from discharging an employee based on age or other prohibited reasons").

**306** ■■■■■■■■■■■■

ODME. Concluding that summary judgment was properly granted, we affirm.

## I.

■ Before addressing the particulars of Cain's claim, it will be useful to establish the legal framework for analysis. "In considering claims of discrimination under the DCHRA, we employ the same three-part, burden-shifting test articulated by the Supreme Court for Title VII cases in *McDonnell Douglas Corp. v. Green.*" [4]

> In order to survive a motion for summary judgment, [the employee must] establish a prima facie case that [the employer discriminated against] [her]. If such a showing is made, the burden shifts to the employer to articulate a legitimate basis for [its action]. If the employer articulates a legitimate, nondiscriminatory basis for the [action], the burden shifts back to the employee to demonstrate that the employer's action was pretextual.[5]

■ Age discrimination must have "actually played a role in [the employer's decision-making] process and had a determinative influence on the outcome." [6]

Therefore, to establish a *prima facie* showing of discrimination,

> a plaintiff generally must demonstrate (1) that [she] was a member of a protected class, (2) that [she] was qualified for the job from which [she] was terminated, (3) that [her] termination occurred despite [her] employment qualifications, and (4) that a substantial factor in [her] termination was [her] membership in the protected class.[7]

Once the employee has made such a showing "by a preponderance of the evidence"—creating a "rebuttable presumption that the employer's conduct amounted to unlawful discrimination" [8]—the "burden of production," not persuasion, shifts to the employer.[9] The employer can then satisfy its burden "by producing admissible evidence from which the trier of fact [can] rationally conclude that the employment action [was not] motivated by discriminatory animus" but, rather, reflected a "legitimate, nondiscriminatory reason" for its action.[10] If the employer meets that burden, "the presumption of discrimination" raised by the employee's *prima facie* showing "is rebutted and drops from the case." [11] At

---

4. *Hamilton v. Howard Univ.*, 960 A.2d 308, 313–14 (D.C.2008) (quoting *Hollins v. Federal Nat'l Mortg. Ass'n*, 760 A.2d 563, 571 (D.C. 2000)) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)); *see Furline v. Morrison*, 953 A.2d 344, 352 (D.C.2008); *accord Washington Convention Ctr. Auth.*, 953 A.2d at 1072.

5. *McFarland v. George Washington Univ.*, 935 A.2d 337, 346 (D.C.2007) (first, second, fourth, and fifth alterations in original) (quoting *Blackman v. Visiting Nurses Ass'n*, 694 A.2d 865, 868 (D.C.1997)) (internal quotation marks omitted); *see Hamilton*, 960 A.2d at 313, 314–16; *Futrell v. Department of Labor Fed. Credit Union*, 816 A.2d 793, 802, 803 (D.C.2003).

6. *Washington Convention Ctr. Auth.*, 953 A.2d at 1074 (alteration in original) (quoting *Reeves*

*v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)) (internal quotation marks omitted).

7. *McFarland*, 935 A.2d at 352 (quoting *Hollins*, 760 A.2d at 572) (internal quotation marks omitted).

8. *Hollins*, 760 A.2d at 571.

9. *McFarland*, 935 A.2d at 346; *Blackman*, 694 A.2d at 868.

10. *Hollins*, 760 A.2d at 571 (alterations in original) (quoting *Atlantic Richfield Co. v. District of Columbia Comm'n on Human Rights*, 515 A.2d 1095, 1099–1100 (D.C.1986)) (internal quotation marks omitted).

11. *Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1078 (D.C.Cir.1999) (internal quotation marks omitted).

this point, the employee's burden to show that the employer's stated reason for its action was pretextual—a disguise for discrimination—"merges with the ultimate burden of persuasion on the question of intentional discrimination." [12] Thus, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." [13]

 This case is before us on summary judgment, which we review *de novo*. [14] To prevail on appeal, defendants "must demonstrate that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law." [15] Although "we examine the evidence in the light most favorable to the party opposing the motion, '[c]onclusory allegations by the nonmoving party are insufficient to establish a genuine issue of material fact or to defeat the entry of summary judgment.'" [16] The question, therefore, is whether there is any record evidence, after discovery, on which a jury could properly reach a verdict for the party with the burden of persuasion. [17]

**12.** *Hollins*, 760 A.2d at 571 (quoting *Atlantic Richfield Co.*, 515 A.2d at 1100).

**13.** *Hamilton v. Howard Univ.*, 960 A.2d 308, 313 (D.C.2008) (alteration in original) (quoting *McFarland*, 935 A.2d at 346) (internal quotation marks omitted).

It is interesting to note that four years ago both this court and the U.S. Court of Appeals for the District of Columbia Circuit rejected the need to take up, initially, a plaintiff's *prima facie* case of discrimination. Both courts recognized that by the time the case had reached the summary judgment stage the employer had proffered its evidence in defense of the plaintiff's claim; that the presumption of discrimination from plaintiff's claim had likely dropped from the case (like the proverbial bursting bubble); and that the case, therefore, was in a posture for determination of the ultimate question: whether there were genuine issues of material fact that would allow a reasonable jury to find that the employer's proffered reasons for the employment were pretextual, hiding actionable discrimination.

In *Furline v. Morrison*, 953 A.2d 344, 353 (D.C.2008) (footnote citations omitted), we said:

In the present case, because Howard University produced evidence that it suspended Morrison for a legitimate, non-discriminatory reason, we need not pause to analyze whether she made out a *prima facie* case of retaliation at trial or of age discrimination in opposing summary judgment. Instead we may proceed to answer the ultimate question—whether Morrison presented sufficient evidence for a jury to find that retaliation or age discrimination "actually motivated the employer's decision."

Similarly, in *Brady v. Office of the Sergeant of Arms*, 520 F.3d 490, 494 (D.C.Cir.2008) (citations omitted), the court wrote:

In a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*. Rather, in considering an employer's motion for summary judgment or judgment as a matter of law in those circumstances, the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?

**14.** *Hamilton*, 960 A.2d at 313 (quoting *Joyner v. Sibley Memorial Hosp.*, 826 A.2d 362, 368 (D.C.2003)) (internal quotation marks omitted).

**15.** *Id.* (quoting *Colbert v. Georgetown Univ.*, 641 A.2d 469, 472 (D.C.1994) (en banc) (citing Super. Ct. Civ. R. 56(c) for same proposition)) (internal quotation marks omitted).

**16.** *Id.* (alteration in original) (quoting *Hollins*, 760 A.2d at 570).

**17.** *See id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202(1986)).

## II.

Very briefly summarized, Cain presents the following *prima facie* case: at age sixty-two she was a member of a protected class;[18] she was qualified for her job;[19] but she was fired nonetheless because of her age, as evidenced by (1) a "bogus" performance evaluation, (2) Reinoso's decision to hire an unqualified young woman in her thirties to replace Cain, and (3) a pattern of firing older employees and hiring only younger ones.

The trial court initially denied appellees' motion for summary judgment, but, after a hearing and supplementary briefing, granted the motion on the ground that Cain had "not established a *prima facie* case of age discrimination."[20] We are not prepared to evaluate Cain's *prima facie* case and the trial court's judgment of it without understanding the larger context from which it arose—a context from which we can also discern and evaluate appellees' effort to refute Cain's case by establishing a legitimate, nondiscriminatory basis for terminating Cain's employment. We shall therefore assume for sake of argument that Cain has established her *prima facie* case and address whether, in response, appellees have articulated a "legitimate, nondiscriminatory basis" for terminating Cain's employment at ODME.[21]

## III.

 It is undisputed that pursuant to completed her Doctorate in Education at the University of Massachusetts, Amherst.

18. Cain cites federal case law interpreting the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621–31 (2006 & Supp. IV 2010), to establish forty years old as the minimum age for a claim of age discrimination. *Hall*, 175 F.3d at 1077 (ADEA plaintiff must be "at least forty years old"); *Paquin v. Federal Nat'l Mortg. Ass'n*, 119 F.3d 23, 27 (D.C.Cir.1997) (same); *Everson v. Medlantic Healthcare Grp.*, 414 F.Supp.2d 77, 82 (D.D.C.2006) (same). Presumably Cain has noted that this court has "looked to federal court decisions interpreting the [ADEA] when evaluating age discrimination claims under DCHRA." *Washington Convention Ctr. Auth. v. Johnson*, 953 A.2d 1064, 1073 n. 7 (D.C. 2008) (citation omitted); *see McManus v. MCI Communications Corp.*, 748 A.2d 949, 955 n. 7 (D.C.2000). Cain was aged sixty-two when her employment ended at ODME, and she does not allege that Reinoso discriminated against her when hiring any employee over age forty. We therefore can accept the line she draws at that age for this case without ruling definitively whether age forty must always define the line distinguishing comparative age groups in cases like this one.

19. Before her service at ODME, Cain worked in several education-related positions in the District. From 1999 to 2003, she served as a special assistant to Councilmember Kevin P. Chavous on special education issues, and later as a policy analyst for the District of Columbia Board of Education. In 2006, Cain

20. The trial court concluded:

It is an essential element of a *prima facie* case of discrimination under the DCHRA that the plaintiff was discharged, at least in part, "based upon the characteristic that placed her in the protected class." [Citation omitted.] In Ms. Cain's case that characteristic is her age, but there is only a shred of evidence in support of her assertion that she was discriminated against on that basis. She argues that Mr. Reinoso hired only one person over 40 after *November* 2007. This time-limited argument omits acknowledgment that he hired a 62–year–old, Ms. Cain herself, in *April* [sic *January*] 2007. The record is devoid of hostile comments by Mr. Reinoso, or elsewhere in the workplace, with respect to older individuals. Nor is there any other evidence of animus against older workers.

In sum, the record contains no evidence pertaining to age discrimination except a limited hiring history by Mr. Reinoso that includes a person aged 41, a person aged 62, and a number of persons under 40. This is insufficient for any reasonable juror to conclude that a preponderance of the evidence supports age discrimination.

21. *McFarland*, 935 A.2d at 346; *see also supra* note 13.

the Reform Amendment Act[22] adopted three months after Cain was hired, the Mayor gained control over the newly reorganized District of Columbia Public Schools (DCPS), through creation of a separate cabinet-level agency to replace the traditional, elected school board. The Act also gave the Deputy Mayor for Education the authority to reorganize and oversee the Office of the State Superintendent for Education (OSSE) and the Office of Public Education Facilities Modernization, as well as to create and staff a new Office of Ombudsman for Public Education.[23]

In his testimony before the Council of the District of Columbia (Council) on July 7, 2007 (and later under oath on deposition), Reinoso described his task as the Mayor's principal appointee charged with responsibility for these entities through ODME. He explained how he intended to modernize his office in an effort to ensure that ODME provided educational services to the District in a more efficient and effective manner. Among his goals, Reinoso sought to bring to the District a "central, coordinated, and aligned service delivery across all education levels." Implementation of this plan, in addition to oversight of OSSE and the "facilities modernization agency," would require organization of "five core functions" within ODME: (1) advise the mayor on educational strategy; (2) "[c]oordinate across [District] agencies for education-related initiatives"; (3) "[h]ouse and oversee an ombudsman to serve as the point of contact for residents"; (4) "[d]evelop partnerships in a systematic way" among the public and private sectors and non-profit agencies; and (5) "[c]oordinate parent and community involvement initiatives."

Reinoso informed the Council that, as guiding principles, ODME would provide a "lean" structure, and eliminate "redundant activities." ODME, according to Reinoso, had to "remain dynamic and flexible" and "only employ[ ] as many people as are necessary to accomplish [this] mission." He emphasized maintaining a staff with "a broad range of experience and skills sets, with a particular emphasis on the ability to jump into any issue to move it forward." ODME would also seek to avoid activities that duplicated those of OSSE or DCPS. The timeline for the transition, Reinoso added, would "occur[ ] over the next couple of months."[24]

There is a dispute as to when Reinoso informed ODME staff members of impending personnel changes. Reinoso says June 2007; Cain recalls "the end of July or right at the beginning of September."[25] In any event, according to Cain's deposition, Reinoso told everyone that the Mayor required that ODME "downsize," and that he, Reinoso, would help staff members who wished to do so attempt to transfer to OSSE.[26] Cain was interested in working at

22. *See supra* note 1.

23. *See* D.C.Code § 38–191(b)(1)(B) (Supp. 2011); D.C. Law 17–9, title II, section 202 (2007).

24. On September 27, 2007, Reinoso reiterated many of these themes at a follow-up hearing before the Council. Cain worked on some of the language for this testimony that pertained to a Business Plan for the Ombudsman. When asked on deposition whether she had any reason to believe that Reinoso's testimony on September 27th was "false or inaccurate in any way," she answered, "No."

25. Cain avers in her affidavit that at the time of this meeting, it "was well known" that Abigail Smith, a special assistant under age forty, had indicated her intention to leave ODME for a position at DCPS. Smith, in her deposition, states that she informed Reinoso of this intention "sometime in the fall" of 2007.

26. Reinoso did not recall whether he used the term "downsizing" or indicated that positions would be "eliminated," but he did say that he believed that there "were going to be fewer" employees in the office.

OSSE, informed Reinoso of that interest and, as a result, was detailed there.[27] In the meantime, Reinoso was trying to figure out who was going to stay at ODME.[28]

On October 26, 2007, Reinoso informed the personnel office that he wished to dismiss Cain and Jackie Pinckney–Hackett (a woman in her fifties) effective November 30, 2007 (although Cain's leave date was later extended to December 14, 2007). Cain apparently did not learn of her impending separation from service until she received a notice of termination on November 14, 2007, the same day that Pinckney–Hackett received her notice.[29]

The parties dispute why Reinoso ended Cain's employment. Cain acknowledges on deposition, however, that neither Reinoso nor Eric Lerum, Reinoso's chief of staff, ever made any age-related or discriminatory remark to her. Reinoso offers the following explanations.

*Reorganization, Including Downsizing*

In the first place, Reinoso planned to reorganize ODME and downsize to three, or perhaps two, principal "special assistant" positions that would cover three of Reinoso's five proposed core functions:

"interagency" relationships, "partnership" development, and "education strategy." [30] Two of the older special assistants whose employments were eliminated along with Cain's at the end of 2007, Pinckney–Hackett and Julia Lara (a woman over age forty), were not qualified for any of the three positions. Reinoso had hired both of these other senior employees at about the time he hired Cain, but according to his deposition, Pinckney–Hackett's principal responsibility, "responding to parent complaints," was to be shifted from ODME to the new Ombudsman's Office, and "she was not qualified" by education or professional experience for any other position at ODME. Nor was ODME to continue dealing with the issues that Julia Lara had been handling-issues to be transferred to OSSE.

Cain does not dispute Reinoso's judgment, expressed at his deposition, that she was not "qualified either for the interagency position or the partnership position relative to other staff." The issue before us, therefore, concerns her qualifications for one of the newly designed, "education strategy" positions at ODME.

27. As early as September 2007 and again in October, Cain sought a policy analyst position at OSSE. Reinoso, in his deposition testimony, confirmed telling Cain that he would help her find a position at OSSE, but he added that the possible roles for Cain at OSSE, including those "around the State Board or the State Advisory Panel for Special Education, ... didn't pay a salary level at the levels that Bonnie [Cain] was seeking, and there wasn't anything else that made sense, and then ultimately, she was separated." Cain claims in her affidavit that she never "indicate[d] to anyone in OSSE, Mr. Reinoso or anyone else, that a position in OSSE was unacceptable due to salary or other factors."

28. Reinoso recalls telling "everybody that they would be considered for the positions because obviously, you want to consider everybody for positions, and when you have

more people than slots, the only way to do it is through consideration." In her affidavit, Cain states that "Mr. Reinoso assured us that competition would take place. However, no competition for positions ever took place."

29. According to Cain's deposition, she "first received notice" in October 2007 that she would be "separated from service." However, her complaint (paragraph 10) and her "statement of material facts" (paragraph 36) filed in opposition to summary judgment say November 15, 2007.

30. Reinoso would presumably retain responsibility himself for advising the Mayor, and the remaining core function would be housed in a newly created Ombudsman for Public Education. *See* D.C.Code §§ 38–353, –354 (Supp.2011).

## Cain's Performance Evaluation

On November 9, 2007, almost two weeks after Reinoso had asked personnel to prepare her termination papers, Reinoso gave Cain her first formal performance evaluation.[31] According to Cain's affidavit, she left the evaluation meeting with no sense that her performance was anything but "commensurate with [her] position and responsibilities." As to the results, however, the record shows that Cain had the lowest scores in the office. Her evaluation showed a number of "threes," rather than the higher ranking "fours" and "fives." Reinoso testified on deposition that he had given Cain "threes" because she "[m]et expectations." A "five" meant one "exceed[ed] expectations." By contrast, the younger woman who received the education strategy position that Cain sought, Abigail Smith (aged thirty-seven), received mostly fours and fives.

Reinoso had several concerns about Cain's performance, including her relationships within the office. As to "teamwork," her evaluation (scored a "three") stated that she "need[ed] to improve in this area by working well with all team players." Specifically, Reinoso stressed on deposition that Cain had "worked well with some members of the team but not others." He identified tensions between Cain and another staff member with whom she was working on a project, and he explained how he had to counsel each on how to work more effectively together "to ensure that the team could move forward on its work."

Furthermore, Cain's evaluation stated (again, scored a "three") that she "need[ed] to improve on her ability to work on projects with less supervision."

In advocating for her qualifications, Cain has emphasized that she drafted a well-received Business Plan for the new Ombudsman's Office that was posted on the Mayor's website in April 2007 and was still a "fixture" there. In commenting on Cain's development of that plan, however, Reinoso noted that Cain's initial efforts did not have "clarity and structure." Reinoso himself had to undertake research, provide business plan templates, show Cain how to adapt them to a government setting, and become "more involved than [he] should have been as a manager."

## Superiority of Another Applicant

Especially important to Reinoso's decision to end Cain's employment was her qualifications vis-à-vis other candidates for the education strategy position. Reinoso's deposition reveals that even though Cain "was broadly qualified ... around the education strategy position" (the focus of her ODME work), Reinoso concluded that, "relative to the other staff members who were also broadly qualified for the education strategy position, her performance was not of the caliber to make her a finalist." Reinoso continued:

> Our focus areas within the office in terms of staffing were the interagency responsibilities for which Ms. Cain was not qualified, the partnership position for which we had a more qualified candidate and incumbent in place in that job, and the education strategy position for which we also had someone who was significantly more qualified for the job.
>
> I was unable to find a position within our ... reorganized structure, that fit her experience level, her demonstrated

---

**31.** Cain claims that employee evaluations were not forthcoming until after several months into her employment when ODME employees were informed that they would be subject to "formal evaluation," the criteria for which were never provided to her or other ODME staff.

capabilities, and I had to make a reduction.

Ultimately, the fact that I wasn't able to find a fit for her or that she was not competitive with other candidates for the position that she was broadly qualified for, and the fact that her performance was lower than any other candidate for said positions, led me to the decision to separate Bonnie. Again, not without significant effort in trying to find another position for her either in the family of agencies that I was responsible for or elsewhere in the Government.

Reinoso then compared Cain's qualifications to those of the successful applicant, Abigail Smith, who:

> had more than ten years of experience with Teach for America, served as national public policy director, was well regarded nationally, had a tremendous network nationally, had also on a performance basis, hadn't required next to any management in terms of being given an assignment with broad parameters and then being able to finish it on time and of high quality in terms of work

product. . . . Ms. Cain just didn't bring anything that compares to Abigail Smith in terms of research experience, national experience, on panels, on policy issues, relationships with education, national and local education leaders across the country.[32]

Reinoso ultimately separated Cain, Lara, and Pinckney–Hackett from employment with ODME.[33] They left at around the same time in December 2007[34] after Reinoso had attempted unsuccessfully to find Cain and Lara positions with OSSE.[35]

ODME was no longer to function in the areas staffed initially by Lara and Pinckney–Hackett, and although Cain "was broadly qualified . . . around the education strategy position" retained within ODME, Reinoso articulated strong reasons, based on evidence, showing why she was distinctly less qualified than another member of the staff, Abigail Smith. As noted earlier, moreover, Cain acknowledged on deposition that neither Reinoso nor his chief of staff ever disparaged her with reference to her age or ever made any other age-related or discriminatory remark to her. And

---

**32.** As a special assistant to Reinoso, Smith—hired in January 2007 at age thirty-seven—worked approximately two-thirds to three-quarters time, and, according to Cain, frequently worked from home. Reinoso elaborated on deposition that Smith, as national public policy director for Teach For America, had been "responsible for reviewing and running" its research unit, as well as "researching other education reform issues that would be germane to her work" there. Moreover, Smith, he said, had considerable expertise on education policy and had "worked with school districts around the country on education issues." Her credentials, Reinoso stressed, were "amazing," and she was "recognized nationally as one of the top people in the field." According to Reinoso, Smith "appeared on numerous panels at conferences" and, because of her large network, "could call on folks across the country to ask questions, to get data or get other information that

would be helpful in reviewing questions that we were reviewing."

**33.** According to deposition testimony by special assistant Tara Bridgett, the "special assistant" positions held by Cain, Lara, and Pinckey–Hackett were subsequently recharacterized as social worker positions—in particular for "clinical supervisors . . . for the D.C. START Program[,] . . . a social worker program in the D.C. schools."

**34.** Cain notes in her affidavit that another over-forty ODME employee had lost her job, but Cain acknowledges that this employee had been fired earlier for off-duty misconduct.

**35.** It is unclear whether Reinoso tried to help Pinckney–Hackett find a job at the new Ombudsman's Office, where her ODME experience would have been applicable, but apparently she did not find employment there.

Reinoso expressly denied under oath that he had let Cain go because of her age.

We must conclude, therefore, that appellees have responded with a legitimate, nondiscriminatory explanation for Reinoso's decision to separate Cain from ODME employment premised on his respective evaluations of Cain's and Smith's professional abilities, work experience, and promise for the remaining, but newly designed, "education strategy" position at ODME. If Cain is to prevail, she must do so by reference to material facts of record that suggest a genuine issue as to whether appellees' explanation was pretextual—an undertaking, as we have noted, that "merges with the ultimate burden of persuasion on the question of intentional discrimination." [36]

## IV.

 When we address whether the employer's actions were pretextual, the analysis proceeds as follows:

> whether the jury could infer ... discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence

of a strong track record in equal opportunity employment).[37]

Usually, "a *prima facie* case plus sufficient evidence to reject the employer's explanation will suffice without more to overcome a motion for summary judgment or judgment as a matter of law." [38] Nonetheless, we have cautioned that "the emphasis is on the need for *evidence:* As courts are not free to second-guess an employer's business judgment, a plaintiff's mere speculations are insufficient to create a genuine issue of fact regarding an employer's articulated reasons for its decisions." [39] Accordingly, at this "pretextual" stage of the proceeding, the nonmoving party—here, Cain—must designate from her own affidavit, the deposition testimony, and other discovery material (including exhibits), the "specific facts showing that there is a genuine issue for trial." [40]

 Cain's foremost argument on appeal—and thus in her effort to characterize Reinoso's explanation for terminating her employment as pretextual—begins with her contention that Reinoso's evaluation of her performance at ODME was "bogus." That evaluation, Cain says, covered up his real motivation: to discriminate against her on the basis of age by terminating her employment in favor of a less-qualified, younger woman, Abigail Smith. Cain's principal evidence comes from Reinoso's preparation of ODME's "Academic Plan," which, Cain alleges,

---

**36.** *Hollins v. Federal Nat'l Mortg. Ass'n,* 760 A.2d 563, 571 (D.C.2000); *see supra* Part I.

**37.** *Furline v. Morrison,* 953 A.2d 344, 353–54 (D.C.2008) (internal quotation marks omitted).

**38.** *Id.* at 354.

**39.** *Id.* (internal quotation marks omitted). "[N]either a court nor a jury sits as a super-personnel department that re-examines an en-

tity's business decisions." *McFarland v. George Washington Univ.,* 935 A.2d 337, 350 (D.C.2007) (quoting *Holcomb v. Powell,* 433 F.3d 889, 897 (D.C.Cir.2006)) (internal quotation marks omitted).

**40.** Super. Ct. Civ. R. 56(e); *accord Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed. R.Civ.P. 56(e)).

Smith largely crafted out of plagiarized material.

In the spring of 2007, before Reinoso's confirmation hearing, the Council asked Reinoso to prepare an Academic Plan for its perusal. Rejecting Cain's overture to Eric Lerum, Reinoso's chief of staff, to help formulate the plan, Reinoso sought assistance from Smith because of her experience as national public policy director at Teach for America. According to Reinoso on deposition, the turnaround time was tight, and thus he provided Smith with a "dump of information" he had created from "cutting and pasting" anything he found interesting. Cain reviewed the final draft at the request of Lerum, and, according to Cain's deposition, she advised against its submission to the Council because it "had multiple voices and ... it was clear it came from many sources." Lerum replied that the document could not be changed because it was already on the Mayor's website.

Before Reinoso's confirmation hearing on June 27, 2007, the press reported that the Academic Plan contained plagiarized portions of a work product from the Charlotte–Mecklenburg, North Carolina public school system—a revelation that led to a contentious Council hearing that triggered a delay of Reinoso's confirmation for another four months. Responsibility for the failure of attribution became an issue. In response to a Council inquiry, Reinoso replied that the staff member responsible (whom he did not identify) had been "verbally reprimanded" and that he, Reinoso, took "full responsibility." Later, however, in his deposition testimony in this case, Reinoso testified under oath that he himself was the "staff" who had been "appropriately reprimanded" for the plagiarism at a meeting with the Mayor and the City Administrator. Said Reinoso: "I'm responsible for any language in here having

come from the Charlotte–Mecklenburg plan."

Cain argues that Reinoso either lied to the Council by implying that he had verbally reprimanded a third party or lied on deposition in this case to protect Smith. For purposes of summary judgment, says Cain, she "was entitled to the benefit of the inference Reinoso had lied in deposition because he understood that truthful testimony ... would bolster Cain's claim[ ] ... that Reinoso had retained Smith over Cain despite her role in the plagiarism debacle." And, adds Cain, the taint attributable to Reinoso as a result would put the lie to his rating of "Smith's performance much more highly than Cain in areas including 'Dependability' and 'Integrity and Trust.'"

Cain's animadversions against Reinoso and Smith do not reflect evidence that Smith was involved in the plagiarism. Reinoso's sworn testimony is to the contrary, and Smith herself, on deposition under oath, stated her understanding that the language supplied by Reinoso had been written by Reinoso himself. Cain proffers no evidence to contradict the two, only speculation that Reinoso had been covering up for Smith. Speculation, however, does not entitle Cain to the inference of Smith's culpability that Cain claims. Reinoso perhaps can be faulted for not being entirely candid with the Council about who was responsible for the plagiarized inserts, but this failure did not undermine the basic truth of his statement that the culprit had been reprimanded. Nor did Reinoso's testimony before the Council reflect adversely on Smith. In sum, the incident on which Cain relies to undermine Reinoso's motives and Smith's qualifications may reveal poor judgment by Reinoso in pursuit of his confirmation, but it does not provide evidence that Smith was less qualified than Cain for the position at

**315**

issue, or create an implication that Reinoso fired Cain because of her age.

Nor do Reinoso's evaluations of Cain and Smith evince discriminatory motive. Cain does not effectively dispute Reinoso's judgments—elaborated above in Part III—that she needed to improve both her working relationships with others and her ability to work with less supervision.[41] While it apparently is true that Reinoso asked personnel to prepare Cain's employment termination papers before he generated her formal evaluation—understandably causing Cain to take personal offense—that sequence does not, in itself, manifest a false evaluation. Just as likely, the sequence reflected a delayed documentation of Reinoso's long-held views. Considered in light of Cain's failure to rebut Reinoso's criticisms of her work, no genuine issue of material fact is raised with respect to the timing of her evaluation at ODME.

■■■ Next, Cain stresses that Reinoso hired Smith for the new education strategy position knowing that she would soon leave for a position at DCPS—evidence, she says, supporting her argument that Reinoso had hired Smith as a mere excuse to fire the older Cain. The record is unclear as to when Reinoso learned that Smith might, or would, be leaving.[42] But even if he hired her for the new position knowing that she would be a short-timer, that does not suggest that he did so, rather than select Cain, because of Cain's age. In the first place, there is no direct evidence that Reinoso sought to separate Cain or anyone else from employment with ODME because of age; as noted earlier, Cain acknowledged that she never heard anything like that from Reinoso or his chief of staff. Second, early in his tenure at ODME, Reinoso hired three women over age forty—Cain, Pinckney–Hackett, and Lara—hiring decisions that make it highly unlikely that he would fire any, let alone all three, less than a year later because of age.[43] Third, Reinoso's hiring decision was a business judgment to which the courts ordinarily defer.[44] Even if he knew that Smith would be leaving once her arrangement at DCPS could be finalized, it would not have been irrational, let alone

---

**41.** In her reply brief, Cain disputes Reinoso's negative comments in his deposition testimony about her work relationships and need for supervision by referring to his comments in her formal evaluation that she "has a good working relationship with her co-workers" and that she "worked well on developing an Ombudsman Business Plan." As noted above, however, in Part III, Cain received a "three" out of a possible "five" in each of these categories. Moreover, in the same formal evaluation, Reinoso qualified the general comments Cain cites with the criticisms we have quoted.

**42.** *See supra* note 25 and accompanying text.

**43.** We have recognized "a permissible inference" of a non-discriminatory motive when a firing decision is "made by the same person responsible for hiring and promoting the employee." *Ottenberg's Bakers Inc. v. District of Columbia Comm'n on Human Rights,* 917 A.2d 1094, 1103 (D.C.2007) (citing, *inter alia,*

*Bradley v. Harcourt, Brace & Co.,* 104 F.3d 267, 270–71 (9th Cir.1996) (concluding strong inference of nondiscriminatory motive arises where same person is responsible for hiring and firing complainant within short period of time)). Cain argues that this inference is unavailable here because the Mayor, not Reinoso, was the "driving force behind Ms. Cain's employment in the Office of the Deputy Mayor." According to Reinoso, the hiring decision was his alone; individuals involved in the Fenty campaign had only suggested that he "consider" employing Cain. Under these circumstances, we are unwilling to give this "same actor" inference controlling weight, but we do believe that Reinoso's hiring Cain and two others over age forty, then letting them go within a year during an office reorganization, adds some weight to appellees' argument that Reinoso did not end their employments on account of their ages.

**44.** *See* cases cited *supra* note 39.

discriminatory, to hire Smith for the short-term value of her expertise (while looking for an equally able successor), rather than keeping a less satisfactory employee indefinitely.

Particularly given the plagiarism controversy and Cain's formal evaluation after her termination papers were underway, we understand Cain's feelings. But those two incidents—without more—do not supply evidence, as required to forestall summary judgment, that Reinoso let Cain go because of her age.

But there *is* "more," says Cain; the pattern of firings and hirings at ODME confirms Reinoso's discriminatory aversion to older employees. Cain alleges in support of her *prima facie* case that, in the thirteen months following her departure from ODME (as well as the departures of Lara, Pinckney–Hackett, and a month later, Smith), the following employment actions occurred:

(1) A special assistant (Andrea Wilson) and a policy analyst were hired, both aged twenty-six, as well as another special assistant, aged forty-two (Kerri Briggs, destined for a shift to OSSE as its director).

(2) Another special assistant and seven program analysts—one aged thirty-two, the others in their twenties—were hired, not for ODME but for a related "Interagency Collaboration and Services Integration Commission."

(3) No excepted service employee under age forty was fired by ODME, except for one who was let go for off-duty misconduct.

(4) Although the Cain and Smith positions were filled by Wilson and Briggs (the Lara and Pinckney–Hackett positions had been eliminated), another special assistant position had been vacated by the voluntary departure of an incumbent (Mark Ouellette) and remained open.

(5) Thus, with the exception of Briggs (representing a "holding action" on her way to OSSE), Reinoso did not hire anyone over age forty among the ten hired, and he left vacant "at least" one special assistant position in education policy.

Appellees reply that Cain's statistics alone-few in number and subordinate in strength to Reinoso's proffered reasons for his employment actions-do not in themselves undermine Reinoso's legitimate, nondiscriminatory grounds for terminating Cain's employment. In any event, add appellees, contrary to Cain's representations:

(1) In addition to hiring Briggs, aged forty-two, and Wilson, aged twenty-six, Reinoso selected Tonya Kinlow, over age forty, as the new Ombudsman, and hired Wayne Cole, also over age forty, for the constituent services position in the Ombudsman's four-person office;

(2) The other special assistant and seven program analysts were hired not as education specialists but as social workers for the new D.C. START program, created to help students and their families with behavioral issues; and, in any event, Cain has provided no information about the applicant pool that would indicate whether there had been applicants for these positions over age forty;

(3) Reinoso dismissed six or more employees after reorganization, two of whom were under age forty, including one (Wilson) who had been hired after Cain's and Smith's departures and had left because of a "staff reduction";

(4) The vacant special assistant position had been left open to hire a social worker for D.C. START, not another education specialist; and thus

(5) Reinoso hired three employees (not one) over age forty out of twelve

(not ten) hired, eight of whom were social workers for D.C. START, leaving one special assistant vacancy also earmarked for a D.C. START social worker.

Cain, in her reply brief, does not dispute appellees' responses other than to argue that Reinoso's hiring of Briggs should not count because her place at ODME was a temporary "holding action" for eventual employment at OSSE; that Tonya Kinlow's appointment as Ombudsman should not count because that is a Mayoral appointment;[45] and that Wayne Cole's employment in the Ombudsman's office should not count because he reports to Kinlow, as well as because he is a civil service, not excepted service, employee.[46] These distinctions are noticeably thin, however, for two reasons: first, they do not undercut Reinoso's evident willingness to hire employees over age forty, all of whom would be under Reinoso's supervisory jurisdiction; and, second, Cain's emphasis on the youth of the new social workers affords no basis for believing that older applicants applied for those positions, let alone that the jobs were relevant to a claim of age discrimination by a former employee, like Cain, unqualified for such a position—indeed, a position in D.C. START not existing at ODME when she was employed. Finally, given the diversity of titles (*e.g.*, "special assistants," "policy analysts") embracing a variety of tasks (*e.g.*, "education specialist," "social worker")[47]—and further given the "limited

sample"[48] of statistical evidence Cain cites—we must conclude that the parties' dispute over "fires" and "hires" at ODME, particularly in light of the merit-based reasons for terminating Cain's employment, adds no genuine issue of material fact supporting a claim of age-based discrimination.

## V.

We have reviewed Cain's claims about her evaluations, about the hiring of Abigail Smith, and about the pattern of "fires" and "hires" during Cain's tenure at ODME and thereafter. We are satisfied that appellees have answered her allegations of a *prima facie* case with a legitimate nondiscriminatory basis for Reinoso's employment actions, and that on the record of sworn testimony during discovery and related exhibits Cain has not adduced evidence of specific facts demonstrating that those actions were pretextual. Thus, Cain has not shown that age discrimination "actually played a role" and had "a determinative influence" in Reinoso's decision to end Cain's employment.[49] We must agree with appellees, therefore, that no genuine issue of material fact supports Cain's claim of discrimination based on her age. Accordingly, the trial court's entry of summary judgment must be affirmed.

*So ordered.*

---

45. D.C.Code § 38–351(a)(1) (Supp.2011).

46. Whatever the statutory formalities, Reinoso testified on deposition that "Ms. Kinlow was hired by me, over the age of 40," and that the "personnel decisions ... and the staffing levels for that office were managed by me."

47. Tara Briggs, a special assistant in an administrative position, testified on deposition that, for example, a special assistant's posi-

tion could be held by a social worker, as well as by an education specialist such as appellant Cain.

48. *Luhrs v. Newday, LLC*, 326 F.Supp.2d 30, 35 (D.D.C.2004).

49. *Washington Convention Ctr. Auth. v. Johnson*, 953 A.2d 1064, 1073 (D.C.2008) (internal quotation marks omitted).